ANTHONY CRANE RENTAL, INC., Petitioner,

v.

Robert B. REICH, Secretary of Labor, Respondent.

No. 95–1021.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 2, 1995.

Decided Dec. 1, 1995.

**1300**

Richard R. Nelson, II, Pittsburgh, PA, argued the cause for petitioner, with whom Wayne C. Holcombe was on the brief.

Bruce Justh, Counsel, United States Department of Labor, argued the cause for respondent, with whom Thomas F. Williamson, Solicitor, Joseph M. Woodward, Associate Solicitor, and Barbara U. Werthmann, Counsel, were on the brief. Charles F. James, Attorney, entered an appearance.

Before WALD, SILBERMAN and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This is a case about a crane—and about whether the company that leased the crane can be held accountable for the crane's failure to meet safety standards promulgated under the Occupational Safety and Health Act ("OSH Act"). In this case, Anthony Crane Rental ("ACR"), a company which leases and services cranes, appeals a decision of the Occupational Safety and Health Review Commission ("Commission"), penalizing it for violations of the safety standards for cranes used in construction. ACR argues that because it merely leased the crane to another company and was not engaged in construction work, it should not be held liable under the Occupational Safety and Health Administration ("OSHA") construction safety standards. The Secretary of Labor argues, and the Commission ruled, that because ACR leased the crane, created or had control over the hazards at issue, serviced the crane, and performed work "integral" to the construction project, it can be held accountable under the OSH Act.

We agree, but only in part, and affirm those citations for which there was a specific finding that ACR's repairman was exposed to the hazard. With respect to those hazards for which there was no specific finding that an ACR employee was exposed, we decline at this juncture to accede to the Secretary's urging that we adopt the "multi-employer" doctrine, under which an employer can be penalized for exposing employees of *other* employers to a hazard. Rather than applying this broad doctrine for the first time in this circuit on the basis of the record before us, we vacate the citations in this second category and remand so that the Commission may clarify whether in these ambiguous situations ACR's repairman was in fact exposed to the hazards. We also vacate another citation, where it is unclear that anyone was exposed to the hazard, and similarly remand for clarification. Accordingly, we affirm in

part, vacate in part, and remand the matter to the Commission.

## I. BACKGROUND

Anthony Crane Rental operates a facility in West Mifflin, Pennsylvania, which leases, services, and maintains cranes. In 1990, ACR leased a number of cranes to subcontractors engaged in construction at the Greater Pittsburgh International Airport construction project; among these cranes was the equipment at issue here, a conventional truck crane leased to Mid–West Conveyor Construction Services ("Mid–West").

ACR leased most of the cranes under an "owner operated" lease, where it supplied the crane, the crane operator and oiler, and all fuel, maintenance services, and insurance for the crane. However, the crane here was leased pursuant to what ACR calls a "bare rental" lease, the terms of which called for the lessee, Mid–West, to provide the operator and oiler, and arrange for any maintenance or repairs. Though free to hire any company it wished to perform repairs, Mid–West chose ACR to do the servicing on the crane.

The crane was delivered to Mid–West on October 8, 1990. The following day, Jeff Paisley, one of ACR's field mechanics, visited the worksite in response to a complaint about the lowering capability of the crane. He diagnosed the problem, and returned on October 11 to repair it. On October 26, Paisley responded to a request by a Mid–West employee to check the crane because it was not swinging properly. Paisley fixed the problem that day.

Later that day, the boom of the crane collapsed, killing the crane's oiler. After the accident, OSHA investigated the worksite and cited ACR for numerous violations of the construction safety standards for cranes, though none of the alleged violations was related to the fatal accident. OSHA proposed that ACR be fined $82,200 for its violations of § 5(a)(2) of the OSH Act, 29 U.S.C. § 654(a)(2), and its construction industry regulations, 29 C.F.R. § 1910.12.

At the hearing before an Administrative Law Judge ("ALJ"), ACR disputed the factual existence of many of the violations, and argued that because it had leased the crane pursuant to a bare-rental lease, it could not be held liable for OSH Act violations. The ALJ agreed that some of the violations had not been established, but found ACR responsible for others. In addition, the ALJ determined that ACR's activities were sufficiently "integral" to the construction project to justify a finding that ACR was engaged in "construction" within the OSHA regulations. *See Secretary of Labor v. Anthony Crane Rental, Inc.*, OSHRC Docket No. 91–0556 (Mar. 12, 1993) ("ALJ Decision").

The specific violations found by the ALJ were:

(1) **Exhaust Pipe Insulation:** The exhaust pipe and muffler of the crane, which get hot during operation, were not insulated or otherwise protected from contact. 29 C.F.R. § 1926.550(a)(10). (Citation No. 1, item 1).

(2) **Fire Extinguisher:** There was no fire extinguisher in the cab of the crane. *Id.* § 1926.550(a)(14)(i). (Citation No. 1, item 2).

(3) **Inspection Records:** Although the crane was inspected within a year of its rental to Mid–West, ACR did not maintain written records of the inspection. *Id.* § 1926.550(a)(6). (Citation No. 2, item 2(e)).

(4) **Improperly Adjusted Components:** There were four separate violations of 29 C.F.R. § 1926.550(b)(2):

(a) *Boom hoist rachet pawls*—These devices are intended to prevent the crane's boom from falling if the brake should slip. They were bent and not functioning properly. (Citation No. 2, item 3(c), instance 1).

(b) *Hoist drum power down*—This mechanism can help prevent a load from falling, and was not functioning properly. (Citation No. 2, item 3(c), instance 2).

(c) *Boom cable shroud cover*—The rain cover for the cable was not properly adjusted, and might eventually have caused the cable to spool improperly, leading to the boom snapping. (Citation No. 2, item 3(c), instance 3).

(d) *Tail shaft governor*—This device prevents excessive wear on the machinery. The crane was delivered with the device disconnected. (Citation No. 2, item 3(c), instance 4).

(5) **Modifications & Use of Unapproved Replacement Parts:** ACR added several parts to the ratchet pawl assemblies without the crane manufacturer's approval, which could result in part of the boom assembly tearing out of the machine. *Id.* § 1926.550(a)(16), (b)(2). (Citation No. 2, items 5(a) and 5(b)).

(6) **Failure to Make Prompt Repairs:** Mid–West complained about the power down mechanism immediately after the crane was delivered on October 8, and Paisley observed the problem on October 9. However, Paisley did not repair the mechanism until October 11. *Id.* § 1926.550(b)(2). (Citation No. 2, item 6(a)).

(7) **Preventative Maintenance Program:** ACR had an unorganized maintenance program and poor record-keeping. *Id.* (Citation No. 2, item 7).

The ALJ found, however, that the violations were not willful, and thus reduced the penalty to $3,150. The Commission affirmed the ALJ's findings and penalties, *Secretary of Labor v. Anthony Crane Rental, Inc.*, 16 O.S.H.Cas. (BNA) 2107 (1994) ("Comm'n Decision"), and this appeal followed.

## II. Discussion

■ We will uphold the Commission's factual conclusions if they are "supported by substantial evidence on the record considered as a whole," 29 U.S.C. § 660(a), and will uphold other findings and conclusions of the Commission so long as they are not arbitrary, capricious, an abuse of discretion, or contrary to law, 5 U.S.C. § 706(2)(A). We defer to the Secretary's interpretation of the Act and regulations, upholding such interpretations so long as they are consistent with the statutory language and otherwise reasonable. *See Martin v. OSHRC*, 499 U.S. 144,

150–51, 111 S.Ct. 1171, 1175–76, 113 L.Ed.2d 117 (1991); *S.G. Loewendick & Sons v. Reich*, 70 F.3d 1291 (D.C.Cir.1995) (deference is owed only to the Secretary and not the Commission on questions of statutory or regulatory interpretation).

### A. Construction Regulations

■ The OSH Act authorizes the Secretary of Labor to establish safety and health standards, which are binding on employers. 29 U.S.C. § 655. Pursuant to this authority, the Secretary has promulgated the Occupational Safety and Health Standards, also known as the "general industry standards." 29 C.F.R. Part 1910.[1] In addition, the Secretary has adopted several industry-specific standards, including the construction safety standards under which ACR was cited:

The standards prescribed in part 1926 of this chapter are adopted as occupational safety and health standards under section 6 of the Act and shall apply, according to the provisions thereof, to every employment and place of employment of every employee engaged in construction work. Each employer shall protect the employment and places of employment of each of his employees engaged in construction work by complying with the appropriate standards prescribed in this paragraph.

*Id.* § 1910.12(a). Under this regulatory scheme, the general industry standards apply unless they are preempted by specific industry standards.[2] *See generally Brock v. Cardinal Indus.*, 828 F.2d 373, 376 (6th Cir. 1987).

■ If the construction industry standards are to apply—as the Commission found here—ACR must have been "engaged in construction work." The starting point for determining whether ACR met this requirement is 29 C.F.R. § 1910.12(b), which provides, "For purposes of this section, *Construction work* means work for construction, alteration, and/or repair, including painting and decorating."

---

**1.** The general safety standard for cranes can be found at 29 C.F.R. § 1910.180.

**2.** Section 1910.12 in turn refers to § 1926, which contains the precise technical standards for cranes and derricks which ACR is alleged to have violated.

ACR argues that its activities at the Mid–West site were "merely ancillary" to the bare-rental lease, and thus did not constitute construction work. *See* Brief for ACR at 33. This might be a stronger argument if ACR had merely sold or leased the crane, without providing repair services, or if the repair services had been *de minimis*. Clearly, there are circumstances under which a provider of equipment has such a tenuous connection to the ongoing construction work in a project that it cannot reasonably be held to be engaged in "work for construction." But here, the Commission specifically found that by "providing mechanic services on an ongoing and regular basis, ACR engaged in activities which were inextricably linked to the construction project in question." OSHRC Decision at 4. In so finding, the Commission located ACR's activities squarely within a line of cases which have found similar activities to fall within the definition of construction work. *See, e.g., Beatty Equip. Leasing, Inc. v. Secretary of Labor,* 577 F.2d 534, 537 (9th Cir.1978) (leasing and erecting scaffolding on construction site); *Heede International, Inc.,* 2 O.S.H.Cas. (BNA) 1466 (OSHRC 1975) (dismantling of crane on construction site); *West Allis Lime & Cement Co.,* 2 O.S.H.Cas. (BNA) 1453 (OSHRC 1974) (delivery of material to construction site). We find, therefore, that the Commission's conclusion that ACR was engaged in construction work was not an abuse of discretion.

The second question is whether the Mid–West worksite was ACR's "place[ ] of employment." 29 C.F.R. § 1910.12(a). ACR points to *Reich v. Simpson, Gumpertz & Heger, Inc.,* 3 F.3d 1 (1st Cir.1993), a case in which the court found that an engineering firm which had given faulty advice which led to the collapse of part of a building under construction could not be held liable under the construction industry regulations of § 1910.12. The court in *Simpson* said:

> [W]e do not think that the WPI construction site is a "place[ ] of employment" which [the firm] had a duty under OSHA to protect. In our opinion, adoption of the Secretary's interpretation would expand the meaning of the phrase "places of employment" beyond any reasonable boundaries.

*Id.* at 5 (footnote omitted).

However, the *Simpson* decision was based principally on the fact that the engineering firm had no "employees at the actual construction site." *Id.* Therefore, *Simpson* does not suggest to us any cause to depart from the plain language of 29 C.F.R. § 1910.12(a)—namely, that the place where an employee works is a "place of employment." The fact that Mid–West's employees also worked (or even predominated) at the construction site makes it no less a place of employment for ACR's repairman, Paisley. *See Baroid Division of NL Indus., Inc. v. OSHRC,* 660 F.2d 439, 445–46 (10th Cir.1981) (independent company could be penalized for exposing its employee to hazards at a worksite controlled by another employer).

In sum, because ACR was engaged in construction work, and because the worksite was a place of employment for ACR, the Commission properly applied the construction industry standards of 29 C.F.R. § 1910.12.

### B. *Exposure to the Hazards*

The more difficult problem in this case implicates the question of just who was exposed to the hazards posed by the crane. With respect to some of the hazards, the ALJ specifically found that Paisley was exposed. With respect to other hazards, the ALJ found that Mid–West employees were exposed, but did not specifically say whether Paisley was exposed. And with respect to one of the violations—the failure to maintain inspection records—the ALJ did not find that any employee was exposed. ACR does not dispute these findings, but does dispute their legal consequences. Each category requires a separate analysis.

#### 1. *Hazards to Which Paisley Was Exposed*

The ALJ specifically found that Paisley was exposed to (1) *non-insulated exhaust system,* ALJ Decision at 12 ("Respondent's field mechanic ... had access to the areas with the heated pipes and could have been

burned."); (2) *lack of a fire extinguisher, id.* at 13 ("mechanic [was exposed] when he was in the cab or actually working on the crane"); (3) *improperly adjusted boom hoist ratchet pawls, id.* at 31 ("Respondent's employee was at risk when he was near the crane."); (4) *modifications to boom down ratchet pawl, id.* at 41 ("Respondent's field mechanic ... could have been injured in the event of parts failure."); (5) *lack of preventative maintenance program, id.* at 46 ("All of Anthony's own employees ... were exposed to the hazard of cranes which had not been subject to an appropriate preventative maintenance program."). On the basis of the record before us, we affirm the Commission's finding of liability with respect to each of these violations.

 ACR offers several arguments why, despite the exposure of its repairman, it should not be held accountable. First, ACR argues that it should not be penalized because it is basically like a seller of equipment. *See* Brief for ACR at 23. Although it is true that sellers are generally not held liable under the OSH Act for supplying equipment that does not meet OSHA standards, *see, e.g., Johnson v. Koppers Co.,* 524 F.Supp. 1182, 1189 (N.D.Ohio 1981), *app. dismissed,* 705 F.2d 454 (6th Cir.1982), ACR was *not* a mere seller of equipment. To the contrary, it maintained a repair facility for cranes and serviced cranes both in the field and in its own facility. After each rental, the crane was returned to ACR for inspection and necessary repairs. Thus, unlike a typical seller, ACR was in a favored position to learn of defects and to take actions to correct them. *See Central of Ga. R.R. v. OSHRC,* 576 F.2d 620, 623 (5th Cir.1978) (OSH Act "focuses liability where the harm in fact can be prevented").

 Second, ACR argues that it would be unfair to penalize it for the mere act of sending an employee to repair a problem with the crane. Under the Secretary's theory of liability, ACR argues, any repair company could be cited for an OSHA violation by sending an employee into a situation where a hazard exists, even though repairing the problem will make the worksite safer for all the other employees. Here, however, ACR was found to have *created* the very hazards to which Paisley was exposed. Paisley did not go to the worksite merely to repair defects that arose out of the operation of the crane, but rather, defects that ACR should have identified and corrected *before* renting out the crane.[3] Our narrow holding today in no way addresses the general issue of whether an employer which exposes its repair workers to hazards created by others can be held liable under the Act.

 Finally, ACR argues that holding it liable for OSH Act violations under the circumstances of this case would be contrary to public policy and would frustrate the Act's purpose of promoting worker safety, because liability would dissuade lessors from performing repairs. We fail to see, however, how holding the party in the best position to know of any work hazards responsible for exposing its employees to those hazards runs contrary to public policy. At any rate, our review of Commission decisions does not extend to choosing among competing policy options. To the contrary, so long as the path chosen by the Commission is reasonable and consistent with the law—as it was here—we will uphold it.

Therefore, we affirm the Commission's findings and penalties with respect to the above-listed citations.

### 2. *Hazards as to Which Paisley's Exposure is Unclear*

There is a second group of violations, with respect to which the ALJ did not specify

---

**3.** The ALJ properly vacated other citations arising out of hazards over which ACR had no control. For example, the ALJ vacated a citation for failure to check lubricating systems—a duty clearly falling to the lessee. ALJ Decision at 25. The ALJ also vacated a citation based on the failure of the crane's operator and oiler to make adequate inspections. *Id.* Again, this decision was appropriate because ACR had no control over the operator and oiler, who were Mid-West's employees. In addition, the ALJ vacated a citation for failure to post a chart stating the crane's load capacities in the crane of the cab. *Id.* at 15–18. This decision was also appropriate, because the evidence showed that ACR supplied the chart to Mid-West, but Mid-West failed to post it in the cab.

whether Paisley was exposed, but did find that employees of Mid–West were exposed. These violations were (1) *hoist drum power down,* ALJ Decision at 33 ("crane operator, oiler and others working around the crane were exposed"); (2) *boom cable shroud cover, id.* at 35 ("employees, particularly the iron-workers handling the crane's loads, were exposed"); (3) *tail shaft governor, id.* at 37 ("[a]s with similar hazardous conditions, the operator, oiler and those working near the crane at the site were exposed"); and (4) *failure to make prompt repairs, id.* at 43 ("[t]here was exposure of the operator, oiler and other construction workers working in the vicinity").

 It would not be altogether unreasonable to infer that Paisley, as well as other on-site employees, was exposed to some of these hazards. For example, both the boom hoist ratchet pawls and the hoist drum mechanism prevent the boom or the loads it is carrying from falling, and since the ALJ explicitly found that Paisley was exposed to the former, it would not take any great leap of logic to suppose he was exposed to the latter as well. But on review, we do not feel free to choose between competing inferences that can be drawn from essentially factual matters. It is up to the Commission, not us, to determine whether Paisley was exposed to any or all of this second group of hazards. *See Dole v. Williams Enters.,* 876 F.2d 186, 190 n. 8 (D.C.Cir.1989) (citing *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943)).

The Secretary argues, however, that even if Paisley was not exposed to certain hazards, ACR can still be held accountable under what is called the "multi-employer doctrine." As the Commission explained it, "an employer at a multi-employer construction worksite is responsible ... in the absence of exposure of its own employees, for any hazardous conditions which it creates or controls." OSHRC Decision at 6.

 This doctrine, first enunciated in *Brennan v. OSHRC,* 513 F.2d 1032 (2d Cir. 1975), has developed over the past 20 years as a means of apportioning liability at multi-employer worksites where one employer has created a hazard, and some employees, but not necessarily its own, are exposed to it. *See Teal v. E.I. DuPont de Nemours & Co.,* 728 F.2d 799, 804–05 (6th Cir.1984) ("Once an employer is deemed responsible for complying with OSHA regulations, it is obligated to protect every employee who works at its workplace."). *See generally* MARK A. ROTH-STEIN, OCCUPATIONAL SAFETY & HEALTH LAW §§ 161–169 (3d ed. 1990). The basic theory underlying the multi-employer doctrine is that while the language of 29 U.S.C. § 654(a)(1) [4] is specifically limited to situations where an employer's own employees are exposed to hazards, 29 U.S.C. § 654(a)(2) creates liability for violations of specific industry standards (such as the construction industry standards here) where *any* employees are exposed, even if they are not employees of the employer responsible for the violation.

Before *Brennan v. OSHRC,* several courts and the Commission had taken the position that the language in § 654(a)(1), which says that an employer's duty runs to "*his* employees," precluded liability in those situations where employees of another company were exposed. *See, e.g., Brennan v. Gilles & Cotting, Inc.,* 504 F.2d 1255 (4th Cir.1974) (affirming OSHRC decision that general contractor was not responsible for safety of subcontractor's employees). At the Secretary's invitation, the Second Circuit rejected this position:

> But to draw from [the language of § 654(a)(1) ] a general rule that standards under the Act can be violated only when a cited employer's own employees are shown to be directly exposed to a violation of a standard seems to us to be wholly unwarranted. It also fails to give effect to the clause under which [the subcontractor] was cited, subparagraph (2) of § 654(a). That

4. § 654. **Duties of Employers and Employees**
 (a) Each employer—
 (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;
 (2) shall comply with occupational safety and health standards promulgated under this chapter.

subparagraph requires employers to "comply with occupational safety and health standards promulgated under the Act." This specific duty to comply with the Secretary's standards is in no way limited to situations where a violation of a standard is linked to exposure of *his* employees to the hazard. It is a duty over and above his general duty to his own employees under § 654(a)(1).

*Brennan v. OSHRC*, 513 F.2d at 1037–38 (footnotes omitted). In *Teal*, the Sixth Circuit attempted to further dissipate the confusion that had arisen due to the different duties imposed by subsections (a)(1) and (a)(2):

> The difficulty which courts have experienced in attempting to define a particular employer's responsibilities under the Act is due primarily to the varying nature of the separate duty provisions. The general duty clause was intended by Congress to cover unanticipated hazards; Congress recognized that it could not anticipate all of the potential hazards that might affect adversely the safety of workers. Accordingly it enacted the general duty clause [654(a)(1) ] to cover serious hazards that were not otherwise covered by specific regulations.... In contrast, Sec. 654(a)(2) is the specific duty provision. The class of employers who owe a duty to comply with the OSHA regulations is defined with reference to control of the workplace and opportunity to comply with the OSHA regulations. Accordingly, an employers' [*sic*] responsibilities under the Act depend upon which duty provision the employer is accused of breaching.

728 F.2d at 804.

Thus, if an employer is accused of breaching a specific duty—such as the construction industry standards here—the Secretary brings the charge under § 654(a)(2), and urges the Commission and reviewing courts to apply the multi-employer doctrine. Although some of our sister circuits have applied this doctrine in circumstances similar to those here, *see, e.g., Beatty Equip. Leasing*, 577 F.2d at 536–37 (subcontractor who supplied and erected a scaffolding liable, even

where his own employees not exposed); *Marshall v. Knutson Constr. Co.*, 566 F.2d 596 (8th Cir.1977) (general contractor has duty to protect all employees at worksite), the Fifth Circuit has declined to adopt it, *e.g., Melerine v. Avondale Shipyards, Inc.*, 659 F.2d 706, 712 (5th Cir.1981) ("In this circuit, therefore, the class protected by OSHA regulations comprises only employers' own employees."). And indeed, in the peculiar circumstances of "duty to warn" cases, we have upheld OSH Act violations where the employees "exposed" were not those of the violating employer. *See Durez Div. of Occidental Chem. Corp. v. OSHA*, 906 F.2d 1 (D.C.Cir.1990) (rejecting petition for review by chemical manufacturer charged with not adequately warning downstream employees of hazards, but not addressing applicability of multi-employer doctrine); *General Carbon Co. v. OSHRC*, 860 F.2d 479 (D.C.Cir.1988) (same). But as the Secretary candidly admits in his brief, this court has not yet explicitly considered whether the duty to comply with the standards imposed by § 654(a)(2) requires an employer to protect employees other than its own.

There are two concerns which militate against making that decision on the basis of the present record in this case. First, it is not clear to us that the multi-employer doctrine is consistent with the Secretary's own construction industry regulation, 29 C.F.R. § 1910.12(a). That regulation, discussed in *supra* Section II.A. of this opinion, requires employers to comply with the "occupational safety and health standards" of 29 C.F.R. Part 1926. In other words, § 1910.12 requires compliance with the specific industry standards referred to in § 654(a)(2). However, the language of § 1910.12, which says that "[e]ach employer shall protect the employment and places of employment of each of *his employees*" (emphasis added), is in marked tension with the multi-employer doctrine we are asked to apply here. In contrast, the Hazard Communication Standards at issue in *Durez* and *General Carbon*[5] specifically required chemical manufacturers to "furnish information to 'downstream' employ-

5. 29 C.F.R. § 1910.1200.

ers," *General Carbon,* 860 F.2d at 481, thus making it entirely consistent with application of the multi-employer doctrine. Here, the relevant regulation by its terms only applies to an employer's *own employees,* seemingly leaving little room for invocation of the doctrine. At any rate, the parties have not briefed this issue, nor has any court that has adopted the multi-employer doctrine explicitly considered it. Consequently, we leave to a later date the critical decision of whether to apply the multi-employer doctrine where an employer has been cited under the construction industry regulations of 29 C.F.R. § 1910.12.

Moreover, as we pointed out, it is possible that Paisley *was* in fact exposed to some of the hazards in question here, and that the ALJ merely failed to make a sufficiently explicit finding to that effect. It is certainly not beyond the pale to believe that if the improperly adjusted boom hoist ratchet pawls exposed Paisley to the risk of the boom falling, other violations, such as the improperly adjusted boom cable shroud cover, which risked causing the boom to snap, produced a comparable exposure for Paisley. We hesitate to plunge into the thicket of the multi-employer doctrine if there is a narrower ground on which liability may be imposed.

Accordingly, the findings of liability for the above-listed violations are vacated, and the matter is remanded to the Commission, which may conduct further inquiries or make further findings as to the exposure of ACR's own employees to this category of risks.

### 3. *Hazards as to Which Exposure of Any Employee is Unclear*

The ALJ and Commission did not specify whether any employees were exposed to the hazard arising from failure to maintain written inspection records. *See* ALJ Decision at 20–24. Although there may well be some OSH Act violations for which exposure is not required, *see generally* ROTHSTEIN, *supra,* § 169, the Secretary has not argued here that this violation is among them. Accordingly, this citation is vacated, and on remand, the Commission may make more detailed findings as to exposure.

### III. CONCLUSION

For the foregoing reasons, we affirm the Commission's finding of liability with respect to the citations discussed in subsection II.B.1 of this opinion (Citation No. 1, item 1; Citation No. 1, item 2; Citation No. 2, item 3(c), instance 1; Citation No. 2, items 5(a) and 5(b); and Citation No. 2, item 7). Because the four instances of violation of Citation No. 2, item 3(c) were all grouped together for purposes of assessing the fine, that penalty is set aside, and the Commission must re-determine the proper fine for the one instance we affirm. With respect to the remaining citations discussed in subsections II.B.2 and II.B.3 of this opinion (Citation No. 2, item 2(e); Citation No. 2, item 3(c), instances 2, 3, and 4; and Citation No. 2, item 6(a)) we vacate the Commission's findings of liability, set aside the fines, and remand for further consideration consistent with this opinion.

*So ordered.*