**CH2M HILL, INC., Petitioner,**

v.

**Alexis HERMAN, Secretary of Labor, and Occupational Safety and Health Review Commission, Respondents.**

No. 98–3282.

United States Court of Appeals, Seventh Circuit.

Argued May 13, 1999.

Decided Sept. 23, 1999.

Francis R. Croak (argued), Kevin J. Lyons and Steven L. Nelson, Cook & Franke, Milwaukee, WI; Robert C. Gombar, Arthur G. Sapper, McDermott, Will & Emery, Washington, DC, for CH2M Hill, Inc.

Charles F. James (argued), John Colwell, Department of Labor, Washington, DC, for Alexis M. Herman.

Charles F. James (argued), Department of Labor, Washington, DC; Ray Darling, Jr., Occupational Safety & Health Review Commission, Washington, DC, for Occupational Safety and Health Review Commission.

Paul M. Smith, Jenner & Block, Washington, DC, for American Institute of Ar-

chitects, National Society of Professional Engineers, American Society of Civil Engineers and American Consulting Engineers Council.

Before BAUER, MANION and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Whenever accidental death occurs, it is human nature to place blame. During a massive construction project on the Milwaukee sewer system, three men died when methane gas located in the tunnel in which they had been working exploded. During the aftermath, the Secretary of Labor ("Secretary") issued a citation to CH2M Hill Central, Inc. ("CH2M Hill"), the firm that Milwaukee had hired as consulting engineer. On administrative review, CH2M Hill argued vigorously that the construction standards under which it had been cited did not apply to it as a professional firm not "engaged in construction" and the initial Occupational Safety and Health administrative law judge agreed with CH2M Hill. However, on review, the Occupational Safety and Health Review Commission ("Commission") concluded the standards did apply to CH2M Hill. On remand, a second Occupational Safety and Health administrative law judge found CH2M Hill had violated the regulations and imposed a series of fines. We agree with the initial administrative law judge's conclusions and reverse.

## I. History

In 1977, the Milwaukee Metropolitan Sewerage District ("MMSD" or "District"), a municipal agency, undertook the $2.2 billion Milwaukee Pollution Abatement Program ("Program"). The Program called for the construction of eighty miles of sewer tunnels. MMSD contracted with a variety of companies to ensure completion. MMSD had contracted with S.A. Healy Co. ("Healy") to construct one of the tunnels, CT-7. MMSD also contracted with CH2M Hill to serve as the lead engineering consulting firm for the project.

On November 10, 1988, an explosion occurred in tunnel CT-7. The explosion resulted from the ignition of an unexpectedly high concentration of methane gas in the tunnel. When the tunnel boring machine's methane monitor detected a high concentration of methane, Healy supervisors evacuated its employees, as they had done the day before when a similar concentration had been detected, but did not turn off the electrical power. Contrary to the Healy evacuation plan, the three supervisors re-entered the tunnel after only seventeen minutes had elapsed since the detection. They were killed when the gas exploded, presumably after one of the three attempted to operate the grout pump, which was not explosion-proof. After this accident, the Secretary issued citations to Healy and CH2M Hill.

CH2M Hill's responsibilities regarding this tunnel arose from a relationship between MMSD and CH2M Hill that consisted of a series of agreements. The primary contract was the Master Agreement. In it, CH2M Hill and MMSD specified the firm's general responsibilities for working on the Program. It explained CH2M Hill's responsibilities by stating:

> The ENGINEER is responsible for the professional quality, technical accuracy, timely completion and coordination of all designs, drawings, specifications, reports and other services furnished by the ENGINEER under this AGREEMENT. The standard of the ENGINEER's responsibility shall be no higher or lower than the standard for similar services performed under the EPA regulations for the Construction Grants program. ENGINEER shall comply with EPA quality assurance requirements in 40 CFR 30.503. The ENGINEER shall correct or revise any errors, omissions, other deficiencies in his designs, drawings specifications, reports and other services without any additional compensation beyond what would have been received in the absence of such errors or

omissions. Any services corrected or reperformed by the ENGINEER shall be subject to this section to the same extent as services originally performed.

The Master Agreement continued by providing a general description of the services that MMSD could ask CH2M Hill to perform. The list was not meant to be exhaustive. These examples focused on activities that CH2M Hill would offer to MMSD, such as recommendations, reports and reviews of information collected by CH2M Hill. CH2M Hill also agreed to "direct, coordinate, and monitor all aspects of the PROGRAM as defined [in the Master Agreement] or in subsequent TASK ORDERS."

In addition to describing what MMSD could call upon CH2M Hill to do, the document also specifically details those matters for which CH2M Hill had no responsibilities. It states:

> Visits to the construction site and observations made by the ENGINEER or ASSOCIATE CONSULTANTS shall not relieve a construction contractor of its obligation to conduct comprehensive inspections of the work sufficient to ensure conformance with the intent of the construction contract documents, *and shall not relieve a construction contractor of its responsibility for means, methods, techniques, sequences and procedures necessary for coordinating and completing all portions of the work under the construction contract and for all safety precautions incidental thereto.*

(emphasis added). The contract continued stating:

> [ENGINEER'S or ASSOCIATE CONSULTANTS'] day-to-day inspection or construction management activities will not, however, cause the ENGINEER or ASSOCIATE CONSULTANTS to be *responsible for those duties and responsibilities which belong to the construction contractors and which include, but are not limited to, the contractors' responsibilities for the techniques and sequences of construction and the safety*

*precautions incidental thereto and for performing the construction work in accordance with the construction contract documents.*

(emphasis added). It also noted that:

> The ENGINEER shall act on behalf of the DISTRICT during construction, but the ENGINEER shall not direct or supervise the contractor's personnel, or operate or directly use equipment. The construction contractors shall remain responsible for construction means, methods, techniques, procedures and safety precautions on the construction portions of the PROGRAM.

For individual jobs, MMSD and CH2M Hill created Task Orders explaining CH2M Hill's role in more detail. In Task Order 189, MMSD and CH2M Hill agreed that the firm would consult on the construction of tunnel CT–7. According to this document, CH2M Hill agreed to assist MMSD with bid and award services, basic architectural and engineering services and inspection services. The parties specified:

> The level of effort of the ENGINEER represented in this Agreement is less than required to perform the generally accepted practice or standard engineering and management services during construction as *the DISTRICT intends to share in the performance of such services.* The DISTRICT will provide on the date of the Notice to Proceed and for the life of this Agreement a Staff Engineer. Activities to be performed by the DISTRICT include but are not limited to the following.

> . . .

> 4. Approve or reject the ENGINEER'S recommendations for resolution of claims, disputes and/or deviations from the Contract Documents.

> 5. *Authorized preparation of Contract Modifications and provide administrative approval of Contract Modifications upon completion by the ENGINEER.*

(emphasis added). The Task Order specifically forbade CH2M Hill from supervising and directing Healy or any other contractor. The Task Order also did not require CH2M Hill to oversee the means and methods of work or safety, but it did require CH2M Hill, among other things, to "[a]dminister the contracts in accordance with the requirements of the Contract Documents and act as the DISTRICT's representative during construction," review the contractor's submission to ensure compliance, monitor and review project schedules, prepare specifications for contract modifications and inspect the work for conformance with the contract documents. In turn, MMSD had contracted with Healy to control the means and methods of the work and safety for tunnel CT–7's construction. In addition, only MMSD could stop work on the tunnel. While CH2M Hill could note violations of the contract by Healy, it could not require Healy to fix any problems.

As part of these contractual duties, CH2M Hill also "[i]nvestigate[d] and prepare[d] documentation in response to contractor claims of differing site conditions." This process, known as a "differing site condition" ("DSC") procedure, enabled contractors to request modifications in their contracts if once they engaged in their work they discovered that conditions were materially different from those assumed when they submitted their bid to MMSD. CH2M Hill's role in this process was to "[n]egotiate proposed contract modifications with the Contractor's representatives and make specific recommendations. Upon authorization by the DISTRICT, prepare and submit the contract modifications to the DISTRICT for submittal to the agencies for approval." MMSD had to approve any contract modification. It had similar responsibilities with regard to another tunnel, CT–8.

Before the explosion in CT–7, the general contractor for tunnel CT–8 had discovered methane gas during its pre-construction tests. In response to these findings,

MMSD invoked the DSC procedure and directed CH2M Hill to investigate the findings. In turn, CH2M Hill hired Engineering–Science, Inc., ("ESI") to conduct the investigation. ESI found that a risk of ignitable concentrations of methane existed, but it could not definitely determine the amount of methane or where the methane was located. Based on these findings and those of another expert hired by CH2M Hill, the firm recommended to MMSD that the project continue and drafted a contract modification for the CT–8 tunnel. MMSD reviewed and approved the draft language. The modification, in part, stated:

> M. *Tunnel Equipment*
>
> All electrical motors, accessories and installations and electrical equipment in the shafts and tunnels shall conform with Class I, Division 2 requirements of Subpart K, OSHA Standards (29 C.F.R. § 1926) published 1987.

At this time, MMSD also decided to modify unilaterally all of its tunnel contracts, including the contract with Healy for tunnel CT–7, to avoid future DSC procedures on the same topic of methane gas.

In May 1988, Healy requested from CH2M Hill a clarification with regard to whether certain types of electrical equipment were approved under this modification. After discussing the issue with MMSD, CH2M Hill provided Healy with further explanation. Specifically, it stated:

> The clarification of ¶ M — Tunnel Equipment is that only electrical gear associated with the mining machine is required to meet Class I, Division 2 requirements. Healy's existing locomotives meet the intent of the specs. He [Healy's project manager] should be reminded that the locomotives must be equipped with portable methane monitors.
>
> Healy should also furnish confirmation [of Class I, Division 2 status] from Lovat [the manufacturer of the tunnel boring machine] concerning the mining equipment. Assuming the confirmation is

positive, nothing else is required for this contract.

Based upon CH2M Hill's duties and its responsibilities with regard to the DSC procedure, the Secretary, after the explosion in tunnel CT–7, cited CH2M Hill for willful violation of the construction standards that apply to employers "engaged in construction work." Specifically, the Secretary contends that CH2M Hill violated 29 C.F.R. § 1926.407 by using unapproved electrical equipment in tunnel CT–7. CH2M Hill challenges the citation, asserting that it did not engage in construction work within the meaning of that section. The initial trial ALJ concluded that the regulation did not apply to CH2M Hill because it was not engaged in construction work, but rather functioned primarily as a consulting firm providing "typical engineering services." The Commission review panel reversed that decision, finding that CH2M Hill's responsibility for a broad range of services at the site and substantial administrative tasks, as well as its power to reject non-conforming work, oversee project scheduling and its ability to make contract modifications with regard to safety issues gave it de facto authority to supervise the construction of tunnel CT–7. It found that any review by MMSD was merely a rubber-stamp. Concluding that the regulation did apply to CH2M Hill under the Commission's precedent, it remanded the case for determination of whether CH2M Hill had violated the regulations. On remand, an ALJ concluded that CH2M Hill had violated the regulations by permitting unapproved electrical equipment to be used by employees in the tunnel, as evidenced by its clarification memorandum to Healy. The ALJ concluded that the violation was willful because CH2M Hill employees entered tunnel CT–7 regularly and that CH2M Hill knew OSHA standards required the use of only approved electrical equipment but had authorized Healy to use unapproved equipment. In the end, the ALJ affirmed forty violations found in the citation and assessed fines of $5000 for each violation.

The Commission rejected CH2M Hill's petition for review of this second decision. CH2M Hill appeals.

## II. Analysis

The primary issue presented by this case is whether OSHA's construction standards apply to professional firms with responsibilities similar to those exercised by CH2M Hill in regard to tunnel CT–7. While we offer no opinion as to the "new" test proposed by the Commission and that amici urge us to find invalid, we do conclude that all professionals operating in the field of construction are not per se exempt from complying with these construction standards. Under the facts of this case, we find that because CH2M Hill's responsibilities did not rise to a level that constituted being engaged in construction work, the regulations do not apply to it. Accordingly, we need not determine whether its actions conformed to these standards.

■■■ We uphold the findings of the Commission only if they are supported by substantial evidence in the record. *See Texas Eastern Products Pipeline Co. v. OSHRC*, 827 F.2d 46, 48 (7th Cir.1987). "Substantial evidence exists if the record contains 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *International Union of Operating Engineers, Local 150 v. NLRB*, 755 F.2d 78, 81 (7th Cir.1985) (citations omitted)). With regard to the interpretation of an OSHA standard, we will defer to the Secretary's interpretation if the statutory language is ambiguous and her interpretation is reasonable. *See Martin v. OSHRC*, 499 U.S. 144, 155–56, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991). We owe this deference to the Secretary, not the Commission in regard to questions of statutory or regulatory interpretation. *See id.* at 150–51, 111 S.Ct. 1171.

Congress enacted the Occupational Safety and Health Act of 1970 ("OSHA") to reduce employment-related injuries and ill-

ness. *See* 29 U.S.C. § 651. Under the Act, an employer must "comply with occupational safety and health standards promulgated under this chapter," 29 U.S.C. § 654(a)(2), and, if no applicable standards exist, "furnish to each of his employees . . . a place of employment which [is] free from recognized hazards that are causing or likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1). For further guidance, Congress provided the Secretary with authority to promulgate occupational safety and health standards. 29 U.S.C. § 655. Pursuant to this authority, the Secretary has issued two types of standards. The first, known as the "general industry standards," *see* 29 C.F.R. pt. 1910, act as a default set of standards. In addition, the Secretary has presented various industry-specific standards, such as the construction standards, *see* 29 C.F.R. pt. 1926, under which the Secretary cited CH2M Hill. This regulatory scheme requires that the general industry standards apply unless a specific industry standard preempts them. *See Anthony Crane Rental, Inc. v. Reich,* 70 F.3d 1298, 1302 (D.C.Cir.1995). What the parties in this case contest is whether the industry-specific standards for construction apply to CH2M Hill.

■ To establish that an employer has violated the construction standards, the Secretary must demonstrate "that the cited standard applies, that its terms were not complied with, that employees had access to the violative conditions, and that the employer knew or with reasonable diligence could have known of the violative conditions." *See Secretary of Labor v. Kulka Constr. Management Corp.,* 15 O.S.H. Cas. (BNA) 1870 (1992). The applicable standards in this case deal with electrical equipment. *See* 29 C.F.R. pt. 1926, subpt. K. Specifically, it states:

> Equipment, wiring methods, and installations of equipment in hazardous (classified) locations shall be approved as intrinsically safe or approved for the

hazardous (classified) location or safe for the hazardous (classified) location.

29 C.F.R. § 1926.407(b). This standard applies "to every employment and place of employment of every employee engaged in construction work. Each employer shall protect the employment and places of employment of each of his employees engaged in construction work by complying with the appropriate standards prescribed in this paragraph." 29 C.F.R. § 1910.12(a). Construction work "means work for construction, alteration, and/or repair, including painting and decoration." 29 C.F.R. § 1910.12(b).

The Secretary claims these standards should apply to CH2M Hill because it functioned as an employer engaged in construction work, as evidenced by its contractual responsibilities and its de facto role in approving safety standards in the contract modifications during the DSC procedure. In this role, CH2M Hill, according to OSHA, violated the requirements for electrical equipment installed in tunnels by using unapproved electrical equipment, which included, among other things, the connectors, lighting devices, and control transformers. CH2M, however, contends that it was not engaged in construction work and, therefore, should not be held liable for any potential regulatory violations, all of which it also denies. Upon review of the extensive administrative record, we find that while the regulations may apply to professionals in some situations, they are not applicable to CH2M Hill on this record.

## A. Scope of the Construction Standards

■ CH2M Hill first urges us to reject the Secretary's interpretation of the construction standards that permits their application to professionals, such as engineers and architects. It contends that the plain meaning of the term "construction" creates a per se exclusion of professionals working on or as part of a construction project. In its view, "construction" should

be strictly construed according to its dictionary meaning of building, erecting, or putting together. *See* Webster's Third New International Dictionary 489 (1986). We must look beyond the dictionary definition, however. The regulations define construction work at 29 C.F.R. § 1910.12(b) and cross-reference § 1926.13. Specifically, the regulations state: " '[C]onstruction work' means work for construction, alteration, and/or repair ... See discussion of these terms in § 1926.13 of this title." Thus, we must also consider this source when determining the meaning of "construction."

**1.** CH2M Hill also asserts that 29 C.F.R. § 1910.12 may not be construed differently than the other statutes, specifically the Construction Safety Act ("CSA"), because the Secretary did not adopt the standards through a notice and comment rulemaking procedure. We disagree.

Other circuits have recognized the applicability of this regulation. *See Reich v. Simpson, Gumpertz & Heger, Inc.*, 3 F.3d 1, 4 (1st Cir.1993); *Cleveland Elec. Illuminating Co. v. OSHRC*, 910 F.2d 1333, 1335 (6th Cir. 1990); *National Eng'g and Contracting Co. v. OSHRC*, 838 F.2d 815, 817 (6th Cir.1987); *Brock*, 828 F.2d at 376 (6th Cir.1987); *Underhill Constr. Corp. v. Secretary of Labor*, 526 F.2d 53, 55–56 (2d Cir.1975). We similarly find the regulation applicable.

OSHA authorizes the Secretary to promulgate "established Federal standards" without complying with the rulemaking procedures of the Administrative Procedure Act. *See* 29 U.S.C. § 655(a). It defines an "established Federal standard" as "any operative occupational safety and health standard established by any agency of the United States and presently in effect." *See* 29 U.S.C. § 652(10). In turn, the statute defines an "occupational safety and health standard" as "a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." *See* 29 U.S.C. § 652(8).

The Secretary adopted, under OSHA, the CSA regulations pursuant to this authority. In an attempt to clarify the specific CSA regulations that he was adopting, the Secretary noted that he had not adopted subparts A and B of the CSA regulations, but only the substantive rules. He discarded those portions of the CSA regulations that were not relevant in

While § 1926.13 does not specifically define the term "construction," it states that the Davis–Bacon Act (regarding minimum wage protections under Federal contracts), as well as other federal statutes "have considerable precedential value" in determining the scope of these terms. Thus, as courts before us have done, *see Brock v. Cardinal Indus., Inc.*, 828 F.2d 373, 377 (6th Cir.1987), *abrogated on other grounds by Martin*, 499 U.S. 144, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991), we consider the terms as defined under these statutes as well.[1]

light of the congressional mandate in OSHA. *See* 29 C.F.R. §§ 1910.12(c) and .11(b).

We agree with the Second Circuit's analysis of this history, which concludes:

Those definitions make clear that the Secretary intended to adopt, indeed had the statutory authority to adopt, only those portions of the CSA regulations which require "conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment."

*Underhill*, 526 F.2d at 57. Thus, the Secretary never intended to, nor could he, adopt the CSA word for word.

To determine what part would actually come within the Secretary's authority, we compare OSHA with the CSA. While the CSA limits the type of employers who must comply with the statute, OSHA applies, by congressional dictate, to each employer, who is a "person engaged in a business affecting commerce who has employees." 29 U.S.C. § 652(5). This broader group of employers "shall comply with occupational safety and health standards promulgated under [OSHA]." 29 U.S.C. § 654(a)(2). Thus, the scope of OSHA and CSA are inconsistent with one another. In addition, the Secretary clearly spelled out in the regulations that the OSHA regulations apply to *every* employer. *See* 29 C.F.R. § 1910.12(a). The inconsistency coupled with the Secretary's clear intent to adopt only the CSA regulations consistent with his mandate under OSHA indicates that the Secretary did not intend for the incorporated CSA standards to carry the narrowness of the CSA into the OSHA regulations. Thus, we conclude that the Secretary did not strictly adopt the narrower language of the CSA. In doing so, he in no way violated the process authorized by Congress for the promulgation of established Federal standards.

The parties focus our attention on the Davis-Bacon Act. Pursuant to that statute, the Secretary promulgated regulations that define, among other things, the terms "construction" as "all types of work done on a particular building or work at the site thereof by laborers and mechanics employed by a construction contractor or construction subcontractors ..." 29 C.F.R. § 5.2(j). These regulations exclude professionals, such as engineers and architects, whose work is "primarily administrative, executive, or clerical rather than manual" and are "employed in a bona fide ... professional capacity." *Id.* The Commission has recognized this limitation as well.

It is clear from the definition sections of the CSA [Construction Safety Act] and definitions under the referenced Davis–Bacon Act that the standards enacted under the CSA are directed to the performance of the actual physical craft labor at a construction site and do not apply to those whose functions are administrative or professional in nature. *Secretary of Labor v. Simpson, Gumpertz & Heger, Inc.*, 15 O.S.H. Cas. (BNA) 1851, 1856 (1992) ("SGH"). Thus, CH2M Hill argues that this evidence precludes the Secretary from ever applying the construction standards to professional employers, such as itself.

We disagree that the Secretary or Congress envisioned such a broad exclusion from the construction standards. OSHA and its accompaniment of regulations extend beyond the reach of the other federal statutes referred to in the construction regulations. Unlike the statutes and regulations linked to the construction standards, the Secretary adopted the construction standards under OSHA to apply to *every* employer, not just those with construction contracts with the federal government. *See* 29 C.F.R. § 1910.12(a). Thus, while the Secretary may have referenced other federal statutes as having precedential value, she clearly did not adopt the definitions of these statutes and

their regulations in their entirety. 29 C.F.R. §§ 1910.11(b) & .12(c); *see also Underhill*, 526 F.2d at 57. These definitions must be read in light of the broader reach of OSHA. Thus, the limiting nature of the Davis–Bacon Act's definition of construction must take a back seat to the provision in the construction regulations that make the latter applicable to *all* employers engaged in construction work.

We also note that the Commission has repeatedly rejected arguments similar to those presented by CH2M Hill and concluded that the construction standards may apply to professionals under certain circumstances. For example, an employer acting as architect and manager of a construction project was subject to the construction standards because, like an employer in an earlier decision in *Secretary of Labor v. Bechtel Power Corp.*, 4 O.S.H. Cas. (BNA) 1005 (1976), the employer was directly related to the construction being performed. *See Secretary of Labor v. Bertrand Goldberg Assoc.*, 4 O.S.H. Cas. (BNA) 1587, 1588–89 (1976). Similarly, a firm operating as a construction manager furnishing business administration and management services who exercised "substantial supervisory authority over the construction work at the jobsite" was subject to the construction standards. *Kulka*, 15 O.S.H. Cas. (BNA) at 1871. Yet, it has also concluded that the construction standards do not apply to professional firms when the firm does not engage in substantial supervision over the work or safety program at the construction site. *See Secretary of Labor v. Skidmore, Owings & Merrill*, 5 O.S.H. Cas. (BNA) 1762, 1764 (1977) ("SOM"). Thus, whether or not the construction standards apply has previously been a fact-specific inquiry that appears to turn on the responsibilities assumed by the firms in question.

While a blanket per se exclusion of professionals entering into construction contracts might promote efficiency by avoiding this often expensive and always time consuming process, the broader approach

is also more consistent with congressional intent. The Act's purpose is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources...." 29 U.S.C. § 651(b). Congress designed the Act to enhance compliance with standards and to reduce safety hazards in the workplace, not to punish employers. *See Anning–Johnson Co. v. OSHRC*, 516 F.2d 1081, 1088 (7th Cir.1975). With these points in mind, this Court has concluded that "[t]he underlying rationale in effectuating these purposes by placing primary responsibility on employers is that employers have primary control of the work environment and should therefore insure that it is safe and healthful." *Id.* (citing S.Rep. No. 91–1282, at 9 (1970), U.S. Code Cong. & Admin. News at 5177, 5186; H.R.Rep. No. 91–1291, at 21 (1970)). Thus, Congress did not intend the Act, or the regulations flowing from it, to apply only to some employers and not others, but rather to those employers who were best suited to alleviate hazards at the construction site. A per se exception excluding professionals, regardless of their duties, from liability under the Act and its regulations would diminish the aims of Congress in enacting this legislation. Therefore, the Secretary's goal of adopting a balance as to whom the regulations apply is a reasonable approach. We do not find the Commission's decisions regarding the general applicability to professionals in some cases arbitrary or capricious.

## B. Applicability of the Construction Standards to CH2M Hill

 Prior to its decision in regard to CH2M Hill, the Commission had explained that it would apply the construction standards "to employers who perform no physical trade labor, such as [the respondent], only to the extent that such employers have actual and direct responsibility for the specific working conditions at the jobsite and for any hazards resulting from the actions of any trade contractor." *SGH*, 15 O.S.H. Cas. (BNA) at 1867. Or, stated more succinctly, professionals only have to comply with the standards if they exercise "substantial supervision over actual construction." *SOM*, 5 O.S.H. Cas. (BNA) at 1764. This inquiry has become known as the "substantial supervision" test.

As part of its evaluation of CH2M Hill's responsibilities with regard to the Program, however, the Commission adopted a new test. It stated that an engineering or architectural firm would "engage in construction work" if it:

(1) possesses broad responsibilities in relation to construction activities, including both contractual and de facto authority directly to the work of the trade contractors, and (2) is directly and substantially engaged in activities that are integrally connected with safety issues ... notwithstanding contract language expressly disclaiming safety responsibility.

As we noted in an earlier consideration of this case, this test means:

architects, engineers, and similar professionals should be treated as joint employers with the firms actually carrying out the construction, even if the contracts assign to the project owner full responsibility for directing the work, and to the general contractor sole responsibility for implementing the owner's decisions.

*CH2M Hill Central, Inc. v. Herman*, 131 F.3d 1244, 1245 (7th Cir.1997). However, in *Secretary of Labor v. Foit–Albert Assoc.*, 17 O.S.H. Cas. (BNA) 1975, 1978 (1997), the Commission admitted that it could not always hold professionals responsible for compliance with construction standards.

In an amicus brief, several professional engineering and architecture associations and societies urge us to accept CH2M Hill's arguments and reject the Commission's expanded interpretation of "engaged in construction work." They claim the new test is arbitrary, vague and too broad,

making it inconsistent with the Act. They argue for a return to the "old" test under which the regulations applied only to engineers and architects who exercised "substantial supervision over actual construction." *See SOM*, 5 O.S.H. Cas. (BNA) at 1764. Their views certainly are well supported; however, we need not reach this issue. Even if this "new" test were appropriate, OSHA still fails to establish that CH2M Hill contractually or on a de facto basis exercised direct authority and control over, or substantially engaged in activities integrally connected with, the safety measures for CT–7.

Even though we refrain from basing our decision on the validity of the "new" test, we, however, note our concern as to at least one aspect of the new test—specifically, the Commission's decision to ignore contract language in evaluating to whom the regulations apply. While perfunctory language that does not represent the true responsibilities of a particular employer should not absolve it from complying with the regulations, language exempting an employer from particular responsibilities that the facts confirm the employer does not actually retain cannot be casually thrown aside. Contracts represent an agreed upon bargain in which the parties allocate responsibilities based on a variety of factors. To ignore the manner in which the parties distributed the burdens and benefits is contrary to our notion of contract law. When an owner, such as MMSD, contracts for outside services relating to a construction contract, it's usually the owner who bargains from the position of strength, making it easier for it to shift liability away from itself. *Cf. Anning–Johnson Co. v. OSHRC*, 516 F.2d 1081, 1089 (7th Cir.1975) (stating that general contractors often bargain from the position of strength when contracting with

subcontractors). Thus, the owner's retention of such liability may, in fact, be a significant indicator of the relationship between the parties. The Secretary and Commission cannot ignore the fact that parties to a contract bargained for one to maintain safety responsibilities and for the other to refrain from such responsibility. As one of our colleagues aptly noted:

> Congress, whose underlying rationale in adopting the statute ... was that the employer has control of the work environment and should therefore be responsible for making it safe, could not have intended that the employer be sanctioned for failure to correct conditions he could not correct.

*Anning–Johnson*, 516 F.2d at 1092 (Tone, J. concurring). Ignoring the language of the contract or an attempt to create blanket liability for professionals regardless of their ability to control the safety aspects of a construction site would be, as Judge Tone explained, contrary to the very intent of Congress when it drafted OSHA. The question as to what responsibilities a particular defendant maintained should turn on a factual inquiry based on a review of the record, including the language of the contract.

In this case, no significant evidence in the record supports the factual findings of the Commission that CH2M Hill exercised substantial supervision or control such that it was "directly and substantially engaged in activities that [were] integrally connected with safety issues." The Secretary asserts CH2M Hill did engage in such activities based upon its responsibilities regarding the issuance of the contract modification with regard to discovery of methane gas in tunnel CT–8.[2] Although the Secretary acknowledges that MMSD retained authority to determine the methods of construction and that MMSD asked

---

**2.** In her brief before this Court, the Secretary rests her arguments only on the point that CH2M Hill's responsibilities with regard to the contract modifications as part of the DSC procedure. She contends that this responsibility alone is sufficient to support the conten-

tion that CH2M Hill "engaged in construction work." She does not discuss, as the Commission did in its review, CH2M Hill's other responsibilities. Therefore, we consider only the facts that relate to the DSC procedure and CH2M Hill's role in that process.

CH2M Hill to investigate the problem, she argues that the Commission was substantially justified in *assuming* that the DSC procedures for contract modifications were the mechanism adopted by the parties to address safety concerns and that CH2M Hill must have exercised substantial control over the contractors in its fulfillment of duties related to the DSC procedure. She rests the remainder of her argument on the contention that the record supports the fact that the parties "perceived" CH2M Hill as the organization exercising authority over safety procedures, as evidenced by Healy's deferral to the firm with regard to its safety procedures in relation to the contract modifications for methane gas. This perception, according to the Secretary, stems from CH2M Hill's "hands-on" supervision of critical safety hazards (evidenced by CH2M Hill employees entering the tunnels), its authority to issue contract modifications (evidenced by its drafting responsibilities in the DSC procedures) and the fact that Healy looked to CH2M Hill for an explanation of the contract modification language (evidenced by the communication between the two explaining the contract modification regarding methane). From these conclusions, the Secretary argues that it is reasonable to assume that CH2M Hill could have required Healy to comply with the contract modifications, even though that did not in fact happen in this case.

The problem with the Secretary's argument is that it only presents half of the picture of what was really happening with regard to the contract modifications. First, it is difficult to see how the contract language in Task Order 189 in which the MMSD contract with CH2M Hill to "[n]egotiate proposed contract modifications with the Contractor's representatives and make specific recommendations [and u]pon authorization by the DISTRICT, prepare and submit the contract modifications to the DISTRICT for submittal to the agencies for approval," contractually gives CH2M Hill direct authority over safety procedures in the tunnels. While some contract modifications may deal with issues that raise questions of safety, such as the one at issue in this case, contract modification could occur for more mundane reasons as well, such as inclement weather or supply problems. In addition, any modification dealing with safety had to be approved by MMSD. CH2M Hill could not act on its own. A plain reading of this language does not support the Secretary's claims or the Commission's conclusions that CH2M Hill assumed ultimate responsibility for safety precautions in direct opposition to other language in its contracts with MMSD expressly disclaiming such responsibility.

The Secretary's contention that CH2M Hill's exercised de facto authority over safety in the tunnels also falls short of the mark. The Secretary seems to refuse to acknowledge that while CH2M Hill drafted the contract modification language and served as the contact person for Healy, the firm reported to and had to obtain the approval of MMSD before any modifications were incorporated into the existing contract. The Secretary makes much of the fact that Tom Lutzenberger, MMSD's director of construction, testified that he did not believe he had the knowledge base upon which to make recommendations regarding safety precautions and that although he was informed of CH2M Hill's meetings with Healy, he did not attend them. While it may be true that Lutzenberger did not exercise the control envisioned by the Task Order or that he simply did not have the qualifications to make such decisions, we will not predicate liability on CH2M Hill, who fulfilled its contract duties, because MMSD did not hire qualified individuals to oversee the process for which it had contractually retained responsibility.

In addition, the fact that Healy turned to CH2M Hill for advice does not indicate that CH2M Hill was acting as the de facto director of safety. Before it issued the clarification, CH2M Hill had to check with

MMSD. From the record it is clear that CH2M Hill functioned as an intermediary between Healy and MMSD. MMSD directed the modifications; it ordered CH2M Hill to conduct an inquiry, reviewed CH2M Hill's suggestions and granted the final approval to the draft language, as well as the clarification of it requested by Healy. With this fuller picture, it would be disingenuous to say that the record supports the Commission or the Secretary's conclusion that CH2M Hill played a "central role" as the "nerve center" for developing and implementing safety practices for tunnel CT–7.

A review of the Commission's prior considerations of this matter supports this conclusion as well. The cases in which the Commission has concluded that a "professional" employer is engaged in construction work it has found that the employer, either contractually or in actuality, had substantial control over the safety program at the construction site. In *Bechtel*, 4 O.S.H. Cas. (BNA) at 1007, the Commission found that the construction standards applied to a construction manager who, among other things, coordinated the safety program, was an integral part of the total construction system and functioned in a manner "inextricably intertwined" with the actual physical labor of the construction. Similarly, the Commission concluded that the construction standards applied to an architectural firm that also managed the construction project because it had the authority to stop work until problems were resolved. *See Bertrand*, 4 O.S.H. Cas. (BNA) at 1588. In *Secretary of Labor v. Cauldwell–Wingate Corp.*, 6 O.S.H. Cas. (BNA) 1619, 1621 (1978), the Commission stated that the construction standards applied to a firm employed as a construction manager had significant responsibilities that gave it "substantial supervision over actual construction," including the authority to act on behalf of the owner of the project. Finally, the Commission, in *Kulka*, 15 O.S.H. Cas. (BNA) at 1871–73, decided that the construction standards applied to a management corporation that

exercised substantial supervisory authority over the construction work because it reviewed the safety programs of each contractor, was responsible for giving general instructions to contractors as to how the work would proceed and its own employee assured compliance officers that he would make sure the safety measures would be completed. In all of these cases, the employer in question had authority to direct and control what was occurring at the construction site.

On the other hand, the Commission has also concluded that the construction standards do not apply to professional firms who do not maintain such authority or control. In *SOM*, the Commission vacated a citation issued to a firm finding that the construction standards did not apply to it due to its lack of "substantial supervision over actual construction" because of its limited functions and authority over the work. 5 O.S.H. Cas. (BNA) at 1764. While the firm inspected the work of various contractors to ensure that they met design specifications, employed field representatives to observe the work and could require that work be redone or repaired if it did not conform, the contract expressly denied the firm "the responsibility for or the authority to direct or supervise construction methods, techniques, procedures or safety methods." *Id.* at 1762–63. Similarly, the Commission, again applying the "substantial supervision test," concluded that an architectural/engineering firm was not subject to the construction standards because it did not engage in construction work. *See SGH*, 15 O.S.H. Cas. (BNA) at 1869. The firm's duties included: preparing contract drawings and specifications to conform to local regulations and codes subject to approval by the owner, assisting the owner with the bidding process, undertaking measures to ensure that contractors conformed with the necessary codes and regulations, making on-site inspections and assisting the owner with resolving disputes between it and the contractors. Its responsibilities, like those of SOM, were lim-

ited by a contractual disclaimer, which stated it would not "be responsible for, construction means, methods, techniques, sequences or procedures, for safety precautions and programs in connection with the Work ..." *Id.* at 1854. The Commission concluded that, while the firm was informed of the safety hazard, it "did not assume substantial supervisory authority over" the project, and, thus, it did not come within the scope of the regulation. *Id.* at 1870.

The responsibilities of CH2M Hill are more like those in these latter cases—SOM and SGH—than they are like those in which the Commission found the employers to be engaged in construction work. Like those of SOM and SGH, CH2M Hill's contract severely limited its authority and responsibility over safety programs. CH2M Hill, while it exercised some authority, had only limited authority that was always subject to final approval by MMSD. While CH2M Hill drafted the DSC changes, MMSD (whether it exercised its responsibility attentively or not) had to approve any changes made. CH2M Hill was required to consult with MMSD before such decisions were final. Unlike the employers found to come within the domain of the regulations, CH2M Hill lacked the necessary authority or supervisory responsibilities. CH2M Hill did not function as a coordinator of the safety program; the contract specifically removed this responsibility from CH2M Hill. Nor did it make representations that it would ensure the safety regulations were met. The firm through its drafting of contract modifications did not function in a manner that was "inextricably intertwined" with the actual construction. It could not instruct Healy how to perform the construction work, nor halt the work if the required regulatory safety measures were not met. In fact, in its explanation to Healy, it told the company to seek the advice of the manufacturer of the equipment for compliance. It did not accept that role itself. Thus, based on the Commission's own line of cases, CH2M Hill should not be subject to the construction standards for its work on the Program.

The Commission, in its evaluation of CH2M Hill, appears to have not only departed for no apparent reason from the "substantial supervision" test but also from its own precedent, which clearly supports the original ALJ's findings that CH2M Hill was not engaged in construction work. We find with all due deference to the Commission that its findings cannot be supported by the record, especially in light of its previous decisions on the subject.

### III. Conclusion

We conclude that while the construction standards may apply to some professionals working on construction projects, they do not apply to CH2M Hill in this case because the firm did not engage in construction work based upon its contractual and actual responsibilities. Accordingly, the findings of violations and the imposition of fines are VACATED.