22 A.3d 867

**C & M BUILDERS, LLC**

v.

**Kelly Lynn STRUB.**

**No. 77, Sept. Term, 2010.**

Court of Appeals of Maryland.

June 23, 2011.

</div>

270

William N. Zifchak (Sasscer, Clagett & Bucher, Upper Marlboro, MD), on brief, for Petitioner.

Patrick A. Ferris (Maria Roussos Delacy, Baltimore, MD; Daniel J. Earnshaw, Edgewood, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

GREENE, J.

Kelly Lynn Strub ("Strub"), Respondent, sued C & M Builders, LLC ("C & M"), Petitioner, on behalf of her son

alleging negligence in the death of her son's father, Wayne Barry Nocar, II ("Nocar"). Prior to trial in the Circuit Court for Baltimore City, C & M successfully moved *in limine* to preclude Strub from introducing expert testimony that C & M either owed or breached a statutory duty of care to Nocar pursuant either to the Federal Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.* (2006) ("OSHA") or the Maryland Occupational Safety and Health Act, Md.Code (1991 Repl.Vol., 2006 Supp.), § 5–101 *et seq.* of the Labor and Employment Article ("MOSHA"). C & M moved to preclude that testimony on the theory that it did not owe a statutory duty to Nocar because he was not its employee. Strub contended, however, that C & M was obligated to protect its own employees as well as the employees of other subcontractors from a fall hazard created by stairwell openings in floors that C & M built. Additionally, at the close of all the evidence, C & M moved for judgment asserting that the evidence showed that Nocar assumed the risk of his fatal injury and was contributorily negligent as a matter of law. The trial judge denied the motion and submitted the case to the jury. The jury determined that C & M was not negligent.

On appeal, the Court of Special Appeals held that the trial judge erred in precluding expert testimony regarding particular MOSHA and OSHA regulations because as a "creating employer" C & M owed a duty to Nocar to comply with MOSHA. *Strub v. C & M,* 193 Md.App. 1, 22, 996 A.2d 399, 412 (2010). Additionally, the intermediate appellate court held that the case was properly submitted to the jury and could not have been resolved on C & M's motion for judgment. *Strub,* 193 Md.App. at 27–28, 996 A.2d at 415. We granted certiorari to consider two issues raised by C & M:

1. Did the Court of Special Appeals correctly hold that an employer owes a duty under MOSHA to provide a safe workplace to a person who is not his employee after the employer has left the worksite and has no control over worksite conditions?

2. Did the Court of Special Appeals correctly hold that where a person is aware of an obvious risk of falling,

and voluntarily exposes himself to that risk, and falls to his death, that the inability to show how he fell makes assumption of the risk a question of fact for the jury?

*C & M v. Strub,* 415 Md. 607, 4 A.3d 512 (2010).

We hold that C & M did not owe a duty of care to Nocar pursuant to MOSHA, and, therefore, regulations promulgated under MOSHA were inadmissible as evidence of the standard of care. In addition, we hold that the decedent assumed the risk of injury, as a matter of law, and, therefore, the trial judge erred in failing to grant Petitioner's motion for judgment. Accordingly, we shall reverse the judgment of the Court of Special Appeals and direct reinstatement of the judgment of the trial court.

## Factual and Procedural Background

The following evidence was presented at trial. In the spring of 2006, C & M entered into an oral contract with Bayside Builders, Inc. ("Bayside") a general contractor, to finish framing what was to be a three story row house in Baltimore City, Maryland. As a subcontractor, C & M agreed to complete the framing work, which included framing the walls on the first floor and constructing the flooring, roof and walls for the second and third floors. When C & M arrived at the worksite, the first floor had been framed by Bayside and contained a rectangular 7 ½' × 2 ½' opening in the first floor above the basement that was not covered or guarded. C & M's contract required it to create, and it did create, the same size openings in the second and third floors, so that a staircase system could be installed by the staircase subcontractor, who was scheduled to perform its work when C & M finished its framing responsibilities. C & M used the openings to move plywood, sheathing, lumber and other framing materials between the floors and the roof. The C & M workers built temporary ladders out of 2″ × 4″ lumber that were nailed at the top side rail into each opening in order to move workers and materials between floors. On approximately May 5, 2006, C & M finished the framing work, so the workers removed the ladders and put them in a trash pile on the site and covered up

the basement and first floor window openings with plywood. C & M workers agreed not to cover the stairwell openings before leaving the site because Bayside, who inspected and approved the work, wanted the openings left uncovered for its staircase subcontractor.

Three weeks later, on May 24, 2006, Bayside entered into a contract with Comfort Masters Cooling and Heating, Inc. ("Comfort Masters"), an HVAC subcontractor, to provide and install all HVAC equipment and duct work for the property. Even though the staircases had not yet been installed, Bayside and Comfort Masters agreed that the HVAC work would proceed, i.e., before the staircase sub-contractor began its work. On May 26, 2006, Nocar and two other Comfort Masters's employees, Joshua Tudor (another sheet metal mechanic) and Andrew Pfarr (a helper), arrived at the property to begin the HVAC work. When the Comfort Masters's employees arrived the property was not as C & M had left it: the ladders had been reclaimed from the trash and one had been nailed into the third floor opening, the front door was open, and windows that had been covered with plywood were uncovered and open. Comfort Masters's employees worked for the next three hours inside the row house, climbing up and down the ladders numerous times, through each of the three stairwell openings, carrying tools, duct work and other materials between floors.

Nocar was alone on the third floor of the row house at the time of his fatal accident. Tudor testified at trial that he had been working with Nocar on the third floor prior to the accident, but they could not complete the work required because they had neglected to bring all of the necessary parts with them. Therefore, Tudor climbed back down to the second floor to do work there, but, Nocar remained on the third floor. Tudor explained the accident as follows:

A. [Nocar] yelled down to hand up a ladder. I said, "Okay. Hang on one minute," because I was—it only took me a minute to finish what I was doing. So in the meantime, I was—I was facing the wall. And in the meantime, he stuck his head down the hole, he leaned down in the hole

like this, and he said, "Oh. You (sic) using it. Never mind" I'm like, "Well, you can either take a break for a minute, because I'm only going to be a minute, or you take it and I'll take a break for a minute." And he said—do I say exactly what he said?

Q. Yep?

A. He said, "Fuck it. I'll just climb the bitch." So I said, "Well, be careful. Don't do nothing to get yourself hurt." And he said—the last words that he said to me was, "At least you care."

 \* \* \*

Q. How long after that did you realize an accident had happened?

A. Well, maybe about three or four minutes later, I heard the strangest noise I never heard before. . . . So I started walking over toward the stairwell opening. . . . And that's when I look (sic) down and saw Wayne [Nocar].

Q. At the time you heard this and looked, where was the ladder that had been on the second floor?

A. Dangling over top of the stairwell opening.

Q. And was anybody on the third floor besides Mr. Nocar?

A. Nobody.

Tudor also stated in his testimony, that Nocar was "the only one that could have" removed the nail holding the ladder in place between the second and third floors and pulled the ladder up to the third floor because he (Tudor) did not do it and their third colleague was on the first floor attending to another task. Tudor testified that the "ladder was leaning right where the return box was supposed to go[,]" and that even after they had discussed that they could wait until they had all the required materials, Nocar had "cut a hole in the return box." Tudor stated that "[Nocar] leaned [the ladder] across the hole up against the metal stud. And the metal studs are not made for structural [support]. So when he leaned on it, it bent and tipped the ladder." Nocar fell approximately 26 feet from the third floor into the basement of the row house sustaining fatal injuries.

At trial, Respondent also sought to present evidence, through the testimony of its expert witness, a civil engineer, Brent Leisenring, that C & M violated MOSHA and OSHA regulations that require holes to be guarded and covered at a worksite when any other workers will be foreseeably exposed to them. In a letter to Petitioner's counsel, Respondent asserted that

> Mr. Leisenring is expected to testify, to a reasonable degree of probability, that the Defendants, who each had a hand in the construction of the basement floor and the three floors of the house, should have either ensured that the floor openings should have been covered or had hand rails that were at least 42″ high. The OSHA regulations in reference to the floor openings that were applicable are 1926 (501)(b)(4)(i) and (502)(1)(2)(3)(4)(i), which required floor coverings over the stairwell openings and further requires them to be "secured."

In his deposition, Leisenring testified that C & M was the "creating employer" pursuant to the "Multi-employer Worksite Citation Policy," discussed *infra*, and, therefore, that C & M owed a duty of care to Nocar. Petitioner, however, moved to preclude that testimony on the grounds that the general duties and fall protection standards established by MOSHA and OSHA are owed by an employer only to its employees and that C & M was not Nocar's employer, nor did it have any control or presence on the worksite at the time of Nocar's fatal accident. The trial judge held that Respondent would not be permitted to present expert testimony that C & M owed Nocar a statutory duty under MOSHA or OSHA to have covered the stairwell openings. The trial judge did permit expert testimony that in not covering the stairwells there was evidence of "negligence based on industry standards[,]" but did not permit testimony that there was "a legal duty owed." [1]

---

1. While discussing C & M's motion *in limine*, the trial judge expressed concern that the proffered expert witness, an engineer, should not be permitted to testify to the existence of a legal duty under Maryland Occupational Safety and Health Act, now codified at Md.Code (1991

Leisenring testified that C & M created the openings in the floors and did not cover them, which violated industry standards and was the cause of Nocar's death. Additionally, Leisenring testified that it was "predictable" that other workers would be present at the worksite and that it was the general practice in the industry to guard openings to protect others.

At the conclusion of the evidence, Petitioner moved for judgment and argued that Nocar assumed the risk of injury and was contributorily negligent because he utilized the makeshift ladder inappropriately in close proximity to the stairwell opening in order to work on a task which his colleagues had already decided could not be completed without obtaining other materials. The trial judge denied the motion and submitted the case to the jury, which returned a verdict in favor of C & M finding no negligence on its part in Nocar's death. Additional facts are supplied *infra* as needed.

## I.

At trial, the judge granted C & M's motion *in limine* precluding Strub's expert witness from testifying that C & M had violated MOSHA or OSHA standards and that such violations caused Nocar's fatal injury. The Court of Special Appeals held that the trial judge's ruling was erroneous. *Strub*, 193 Md.App. at 22, 996 A.2d at 412. Petitioner appeals the intermediate appellate court's holding that "[t]he [C]ircuit [C]ourt erred in precluding all testimony regarding OSHA or MOSHA [regulations] because C & M, as an employer that created the openings in the stairwells, exposed its own employees to the hazard and left them unguarded, in violation of MOSHA, could be liable under MOSHA for its violation and,

---

Repl.Vol., 2006 Supp.), § 5–101 *et seq.* of the Labor and Employment Article ("MOSHA") or Federal Occupational Safety and Health Act, presently codified at 29 U.S.C. § 651 *et seq.* (2006) ("OSHA") and could only testify about "industry standards regarding the preparation of the job site as was done by [C & M]" because testimony about the duty arising out of the regulations was beyond the scope of the expertise of the witness.

thus, owed Strub (sic) [Nocar] a duty to maintain a safe workplace...." *Strub*, 193 Md.App. at 22, 996 A.2d at 412.

We have held that the admissibility of expert testimony is generally within the discretion of the trial judge, but when a ruling on the admissibility of evidence is based "on a pure conclusion of law" we review for legal correctness. *Hall v. UMMS*, 398 Md. 67, 82–83, 919 A.2d 1177, 1186 (2007) (quoting *Bern–Shaw Ltd. Partnership v. Mayor and City Council of Baltimore*, 377 Md. 277, 291, 833 A.2d 502, 510 (2003)) ("If 'the trial judge's ruling involves a pure legal question, we generally review the trial court's ruling [for legal correctness].' "); *see Ruffin Hotel Corp. of Md. v. Gasper*, 418 Md. 594, 17 A.3d 676 (2011) ("While the "clearly erroneous" standard of review is applicable to the trial judge's factual finding that an item of evidence does or does not have "probative value," the [legal correctness] standard of review is applicable to the trial judge's conclusion of law that the evidence at issue is or is not "of consequence to the determination of the action."). Thus, we review the trial judge's evidentiary ruling on C & M's motion *in limine* for legal correctness because it "involve[d] a pure legal question," i.e., whether expert testimony pertaining to C & M's violations of MOSHA standards at the construction site was legally relevant to the negligence claim arising out of Nocar's fatality.

 It is undisputed that Nocar was not an employee of C & M, thus the general duty provisions of MOSHA, § 5–104(a) and § 654(a)(1) do not apply.[2] Thus, the Court of

---

2. In *Bethlehem Steel v. Comm. of Labor*, 339 Md. 323, 662 A.2d 256 (1995) we summarized MOSHA and OSHA as follows:

The general duty clause of OSHA, 29 U.S.C. § 654(a)(1), requires that each employer "shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."

The general duty clause of MOSHA, LE § 5–104(a), requires that each employer "shall provide each employee of the employer with employment and a place of employment that is: (1) safe and healthful; and (2) free from each recognized hazard that is causing or likely to cause death or serious physical harm to the employee."

Special Appeals was incorrect in concluding that C & M owed Nocar a "duty to maintain a safe workplace" because that is a general duty that, by statute, runs only to an employer's own employees. Rather, the ultimate question is whether the specific duty clauses of MOSHA, § 5–104(b), and OSHA, § 654(a)(2), applied as between C & M and Nocar, a non-employee, so that C & M's violations of state or federal construction regulations would be admissible evidence of negligence.[3]

Federal courts have concluded that OSHA, § 654(a)(2) "creates a specific duty to comply with standards for the good of all employees on a multi-employer worksite[,]" therefore the

---

OSHA's specific duty clause, 29 U.S.C. § 654(a)(2), provides that each employer "shall comply with occupational safety and health standards promulgated under this chapter." MOSHA's specific duty clause, LE § 5–104(b)(1), provides that "each employer shall comply with this title, each applicable regulation that the Commissioner adopts to carry out this title, and each applicable order that the Commissioner passes under this title."
*Bethlehem Steel,* 339 Md. at 328, 662 A.2d at 258, fn. 7–8; *accord Solis v. Summit Contractors,* 558 F.3d 815, 818 (8th Cir.2009) ("Subsection [654](a)(1) creates a general duty running only to an employer's own employees, while subsection [654](a)(2) creates a specific duty to comply with standards for the good of all employees on a multi-employer worksite."); *Universal Construction Co., Inc. v. OSHRC,* 182 F.3d 726, 728 (10th Cir.1999) (upholding the Secretary of Labor's construction, that "the employer's duty under [§ 654(a) ](1) flows only to its employees."). The scope of the specific duty clauses is at issue in this case.

This Court has noted that "MOSHA and ... [OSHA], are substantially similar. When interpreting federal regulations enforced under MO-SHA, we look to federal cases for guidance." *Bethlehem Steel,* 339 Md. at 328, 662 A.2d at 258 (footnote omitted); *Brady v. Parsons Co.,* 327 Md. 275, 285–86, 609 A.2d 297, 302, fn. 4 (1992) (explaining that the "OSH Act gave the states the option of pre-empting the operation of the federal act by securing approval of the Secretary of Labor of a comparable or more stringent state act" and that MOSHA was approved on July 18, 1985); *accord Labor Commissioner v. Cole Roofing Co.,* 368 Md. 459, 462, 796 A.2d 63, 64 (2002) (footnote omitted) ("MOSHA is modeled on ... (OSHA) ... and tracks the Federal law in most respects.").

3. The "area of the effect of a violation of a statute, ordinance, or administrative regulation in the law of negligence is one in which, indeed, angels fear to tread." Speiser, Krause & Gans, The American Law of Torts § 9:8, 543 (2008) (citing Pope. An Essay on Criticism. III, 1. 625 (1711) ("For fools rush in where angels fear to tread.")).

specific duty extends to a more general class than the general duty to provide a safe environment, which extends only to employees. *Solis v. Summit Contractors. Inc.*, 558 F.3d 815, 818 (8th Cir.2009) and cases cited therein. The Federal Secretary of Labor, who is charged with enforcing OSHA, has implemented a citation policy, "the multiple-employer worksite doctrine," [4] which, as discussed *infra*, places a limitation on the seemingly broad scope of OSHA § 654(a)(2). For example, in federal cases interpreting the administrative application of the doctrine, "creating employers" [5] are held to owe a duty to non-

---

4. The "Multi–Employer Worksite Citation Policy" ("multi-employer worksite doctrine") has been used by the United States Secretary of Labor ("Secretary") to enforce the specific statutory duty under OSHA, § 654(a)(2) to comply with OSHA regulations for the benefit of non-employees where the employer can be considered to have created, controlled, exposed, or corrected a hazard. *Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 819 (8th Cir.2009) (citing OSHA, Field Operations Manual P 10, at VII–6–8 (May 20, 1971)).

The validity of the doctrine has been questioned because it potentially exceeds the Secretary of Labor's statutory authority. For example, the Eighth Circuit has noted:

Recently, the United States Court of Appeals for the District of Columbia Circuit has questioned whether the Secretary's controlling employer citation policy violates OSHA's regulatory framework. *See Anthony Crane Rental, Inc. v. Reich*, 315 U.S.App. D.C. 86, 70 F.3d 1298, 1306 (D.C.Cir.1995); *see also IBP, Inc. v. Herman*, 144 F.3d 861, 865–66 (C.A.D.C.1998) . In *Anthony Crane*, the court stated in dicta that "it is not clear to us that the multi-employer [worksite] doctrine is consistent with the Secretary's own construction industry regulation, 29 C.F.R. § 1910.12(a).... [T]he language of § 1910.12 ... is in marked tension with the multi-employer [worksite] doctrine...." 70 F.3d at 1306. However, because it was unnecessary to the outcome of the case, the court indicated that "we leave to a later date the critical decision of whether to apply the multi-employer [worksite] doctrine where an employer has been cited under the construction industry regulations of 29 C.F.R. § 1910.12." *Id.* at 1307. To date, the only court to have addressed this issue has held that the Secretary's multi-employer worksite policy did not exceed the scope of §§ 1910.12(a). *Comm'r of Labor v. Weekley Homes, L.P.*, 169 N.C.App. 17, 609 S.E.2d 407, 414–15 (N.C.Ct.App.2005).

*Solis*, 558 F.3d at 821–22.

5. The "creating employer" citation policy arises from the "multiple-employer worksite doctrine." A "creating employer" may be liable "for OSHA violations even when [the creating employer's] own employees were not exposed to any hazards related to the violations." *Solis*, 558 F.3d at 826.

employees where there is evidence of responsibility or duty to maintain, and where it is feasible that the employer would be in a position to remedy the hazard. *See e.g., Brennan v. OSHRC,* 513 F.2d 1032, 1037–39 (2d Cir.1975) (holding that a subcontractor on a high-rise project was liable for violations of OSHA regulations where it *"created* the hazards and *maintained the area* in which they were located.... It had *control over the areas* in which the hazards were located and the *duty to maintain* those areas," where only persons that were non-employees were threatened by the hazards.).

Petitioner contends that it was not a "creating employer" according to the "multi-employer worksite doctrine," as interpreted by federal and Maryland cases, so the trial judge properly excluded testimony about the statutes or regulations. Respondent asks that we affirm that C & M was a "creating employer," and, therefore, was in violation of the specific duty clauses of MOSHA and OSHA. Accordingly, Respondent asserts that we should affirm the intermediate appellate court's holding that Respondent's expert witness should have been allowed to testify "about MOSHA requirements and whether the conditions of the construction site would have constituted a violation." *Strub,* 193 Md.App. at 22, 996 A.2d at 412. Contrary to the holding of the Court of Special Appeals, we do not adopt the "creating employer" citation policy of the "multi-employer worksite doctrine" as the legal duty owed by C & M to Nocar in the case *sub judice.* Consequently, the OSHA and MOSHA regulations were not admissible to establish the standard of care in this case.

In essence, MOSHA regulations should only have been introduced as evidence of a statutory duty if Nocar fell within the class of persons meant to be protected by the statute and the injury was one that the statute was designed to prevent. It is a well-established principle of common law that

a plaintiff may establish a *prima facie* case of negligence by showing: '(a) the violation of a statute or ordinance designed to protect a specific class of persons which includes

the plaintiff, and (b) that the violation proximately caused the injury complained of.'

*Allen v. Dackman,* 413 Md. 132, 143–44, 991 A.2d 1216, 1222–23 (2010) (quoting *Brooks v. Lewin Realty,* 378 Md. 70, 79, 835 A.2d 616, 621 (2003)); *Pendleton v. State,* 398 Md. 447, 466, 921 A.2d 196, 208 (2007) (quoting *Remsburg v. Montgomery,* 376 Md. 568, 831 A.2d 18 (2003), ("[e]vidence of negligence may be established by the breach of a statutory duty.")). The Court of Special Appeals held that C & M "owed a duty to comply with MOSHA[,]" but clarified that "a violation of MOSHA [does not] automatically give rise to a tort duty[,]" because it is not a punitive statute. *Strub,* 193 Md.App. at 22, 996 A.2d at 412 (quoting *Brady,* 82 Md.App. at 533, 572 A.2d at 1123 (involving a case in which MOSHA and OSHA did not apply "by their own force" and so "Parsons's source of tort liability [did] not stem from a statutory violation.")).

■ We know that neither OSHA, nor MOSHA, can be used to establish negligence per se. *Solis,* 558 F.3d at 829 (citing *Ries v. Nat'l R.R. Passenger Corp.,* 960 F.2d 1156, 1164–65 (3d Cir.1992)) (holding that § 653(b)(4) prohibits private causes of action including the use of a violation of an OSHA regulation to establish negligence per se). Statutes, regulations, and industry standards, however, may be admissible as evidence of applicable standards of care. *See e.g., Schultz v. Bank of Am., N.A.,* 413 Md. 15, 35, 990 A.2d 1078, 1091 (2010) (holding that evidence of the commercial standards applicable to a professional banker should have been introduced through expert testimony in order to establish the standard of care in a negligence case). Indeed, in *Brady v. Parsons Co.,* 327 Md. 275, 609 A.2d 297 (1992) this Court noted that "although evidence of a violation of an OSH or MOSH Act standard may be admissible *in an appropriate case* to assist the trier of fact in determining whether an employer *or one having the duty of an employer* was negligent, proof of a violation of such a standard does not establish negligence *per se,* nor does it . . . preclude consideration of the defenses of contributory negligence or assumption of risk." *Brady,* 327 Md. at 294, 609 A.2d at 306 (emphasis added).

Thus, the admissibility of OSHA and MOSHA standards depends on whether C & M "ha[d] the duty of an employer[.]" *Brady,* 327 Md. at 294, 609 A.2d at 306.

In this case, the Court of Special Appeals determined that C & M had the duty of an employer because it created the holes in the flooring. *Strub,* 193 Md.App. at 22, 996 A.2d at 412. To reach its holding that Leisenring's testimony about the statutes should have been admitted, the Court of Special Appeals explicitly adopted and applied the "creating employer" citation policy to C & M, which it had previously recognized, but did not apply, in *Murphy v. Stuart M. Smith, Inc.,* 53 Md.App. 640, 642, 455 A.2d 69, 71 (1983).[6] By applying "creating employer" status to C & M, the court extended the reach of any allegedly pertinent MOSHA and OSHA provisions from C & M to Nocar, who was not its employee. In doing so, it agreed with Strub that "the trial court erred in prohibiting Leisenring from testifying that the open holes in the floor violated MOSHA, under which it owed a duty of care to Nocar."[7] *Strub,* 193 Md.App. at 11, 996 A.2d at 405 (footnote omitted).

---

**6.** In *Murphy v. Stuart M. Smith, Inc.,* 53 Md.App. 640, 455 A.2d 69 (1983), the Court of Special Appeals noted:

> The third and final circumstance relates to owners or employers who have either actually created a hazardous condition which violated specific OSHA regulations and to which its own and another's employees were exposed, *Wendland v. Ridgefield Const. Services, Inc.,* 184 Conn. 173, 439 A.2d 954 (1981), or had actual and substantial physical control over the work area, and actual responsibility for the hazardous condition.

*Murphy,* 53 Md.App. at 643, 455 A.2d at 71. The "creating employer" exception did not apply to the facts in *Murphy* because "Smith [the subcontractor] did not create and did not have actual physical control of alleged inadequate lighting conditions at the pick-up point." *Murphy,* 53 Md.App. at 643, 455 A.2d at 71 (holding that "[i]t will suffice that under the facts of this case the Maryland Act [MOSHA] is clearly limited, placing the duty on the "employer" for the benefit of "his employees" and that the trial judge correctly instructed the jury that the statutory duty did not apply.").

**7.** The Court of Special Appeals concluded that the trial judge's ruling precluded testimony that should have been allowed even though it had

The "creating employer" citation policy is a regulatory tool used by the Secretary of Labor to carry out the OSHA enforcement responsibilities against violations of OSHA regulations. A "majority of circuits have expressed approval of the multi-employer doctrine[,]" although the United States Courts of Appeal for the Fifth and Fourth Circuits have rejected it outright.[8] *Jones v. Parsons,* 2004 WL 1254029, 2004 U.S. Dist. LEXIS 10650 (D.Md.2004) (mem.). Federal courts, that have "expressed approval" of the doctrine have held that when a case presents a question of judicial review of an administrative agency action, the federal Secretary of Labor's application of the "creating employer" exception may be upheld where there was evidence of maintenance of the area containing the hazard, or control, where the responsible party was the only one who could remedy the hazard.

---

correctly prohibited testimony as to a legal duty owed to C & M, stating:

> We pause, however, to point out that the trial court *did not err* in ruling that Strub's expert witness could not testify to the existence of a legal duty. As C & M aptly points out, "the existence of a legal duty is a question of law, to be decided by the court." *Doe v. Pharmacia & Upjohn Co.,* 388 Md. 407, 414, 879 A.2d 1088 (2005) (citations omitted). Nevertheless, Leisenring should not have been totally barred from testifying about MOSHA requirements and whether the conditions of the construction site would have constituted a violation.

*Strub,* 193 Md.App. at 22, 996 A.2d at 412 (emphasis added).

8. The Fifth Circuit denied outright the authority of the Secretary to use the "multi-employer worksite doctrine" in *Melerine v. Avondale Shipyards, Inc.,* 659 F.2d 706 (5th Cir.1981) concluding that the doctrine is irrelevant as to non-employees, stating:

> [R]egulations promulgated under . . . OSHA, provide evidence of the standard of care exacted of employers, but they neither create an implied cause of action nor establish negligence per se. While they are evidence of a general standard of care due employees, *they establish no standard of care due third persons.* Therefore, in this negligence action, we reject the argument that the failure of a third party that was not the plaintiff's employer to follow OSHA regulations establishes that third party's negligence.

*Melerine,* 659 F.2d at 707 (emphasis added); *accord Albrecht v. Baltimore & O. R. Co.,* 808 F.2d 329, 332 (4th Cir.1987) (adopting the position of the Fifth Circuit in *Melerine*).

For example, in *Brennan*, the Second Circuit upheld a ruling of the Occupational Safety and Health Review Commission ("OSHRC") that a subcontractor on a high-rise project was liable for violations of OSHA regulations where it "had *control over the areas* in which the hazards were located and the *duty to maintain* those areas[,]" even though only persons that were non-employees were threatened by the hazards, so "[n]ecessarily it must be responsible for creation of a hazard." *Brennan*, 513 F.2d at 1039 (emphasis added). In *Beatty Equipment Leasing, Inc. v. Secretary of Labor*, 577 F.2d 534, 536, 537 (9th Cir.1978), the Ninth Circuit upheld an administrative ruling finding that a subcontractor "created the hazard at the multi-employer construction site by erecting the scaffold and employees of other subcontractors were exposed to the hazard." The Ninth Circuit bolstered it's holding in *Beatty* by distinguishing the offending employer there from one who might not be held liable where "employees were exposed [to a hazard], but which the subcontractors *neither created nor were responsible for* pursuant to their contractual duties." *Beatty*, 577 F.2d at 537 (quoting *Anning–Johnson Co. v. United States OSHRC*, 516 F.2d 1081, 1082 (7th Cir. 1975)) (holding that "one who is to be charged with absolute liability [must] be realistically in a position to comply with the promulgated standards."). In a case of first impression, the Seventh Circuit held in *United States v. Pitt–Des Moines, Inc.*, 168 F.3d 976 (7th Cir.1999) that criminal sanctions could be levied against a subcontractor for willful violations of OSHA regulations, which resulted in the deaths of two non-employees, where the subcontractor "created the hazard, and was the only entity on the site that could reasonably have remedied it." *Pitt–Des Moines*, 168 F.3d at 984.

Thus, in federal cases reviewing the administrative adjudication of the application of the Secretary's enforcement policy, "creating employers" are held to owe a duty to non-employees where there is evidence of continued presence, responsibility, maintenance, etc. at the worksite.[9] C & M does not fit into

9. We note that the "multi-employer worksite doctrine" becomes a relevant analytical framework in judicial proceedings when a regulated

this scheme. The unguarded openings (alleged violations of MOSHA and/or OSHA regulations) in the floors on the second and third stories were undisputably created by C & M, pursuant to their contract, three weeks prior to the arrival of Nocar and the Comfort Masters workcrew. C & M, however, retained no control or oversight at the worksite, and indeed, at the time of the accident, had completely finished its responsibilities under its contract with Bayside and relinquished control of the premises back to Bayside.

It was not contemplated that the scope of Custom Masters's contract work was related to or dependent on the openings, as was the case in *Pitt–Des Moines* where the victim's job was to follow PDM's crew and "bolt-up the connections they made." *Pitt–Des Moines*, 168 F.3d at 985. Nor is this case factually similar to *Beatty* where the subcontractor's role was to install scaffolding for use by subsequent subcontractors and the scaffolding itself violated applicable regulations. *Beatty*, 577 F.2d at 535. Nor was C & M analogously situated to the subcontractor-defendant in *Brennan*, where that employer "created the hazards and maintained the area ... had control over the areas where the hazards were located and the duty to maintain those areas." Thus, in our view, it was not legal error for the trial judge to exclude testimony establishing a standard of care under MOSHA and OSHA where evidence that C & M could have been cited for violations of MOSHA

entity has been cited for an OSHA violation, has challenged the citation in an administrative hearing, has then presented an adverse ruling to the OSHRC (or state counterpart) for review, and has finally brought the adverse order before the court for judicial review. *Solis*, 558 F.3d at 822–23; *Universal Constr. Co.*, 182 F.3d at 727–28; *Havens Steel Co. v. Occupational Safety & Health Review Com.*, 738 F.2d 397, 398–99 (10th Cir.1984); *Comm'r of Labor v. Weekley Homes, L.P.*, 169 N.C.App. 17, 18, 609 S.E.2d 407 (N.C.Ct.App.2005) (sharing the same procedural posture but with state authorities); *Martinez Melgoza v. Labor & Indus.*, 125 Wash.App. 843, 845–47, 106 P.3d 776 (2005) (same). The doctrine has not, however, been adopted by state courts as a mechanism for deciding evidentiary issues in a negligence cases. *Cf. Suarez v. Pacific Northstar Mechanical, Inc.*, 180 Cal.App.4th 430, 445, 103 Cal.Rptr.3d 168 (2009) (reversing summary judgment for a sub-contractor because it had a statutory duty as an "exposing employer" under state statutes which incorporated the "multi-employer workside doctrine").

regulations would be irrelevant to a claim for injuries to an individual to whom the specific duty to comply with the regulations did not exist.[10] *See e.g. Safeco Ins. Co. of Am. v. Dain Bosworth, Inc.*, 531 N.W.2d 867, 873 (Minn.Ct.App.1995) ("An affidavit from an expert cannot create a duty where none exists.").

The Court of Special Appeals erred when it adopted and applied the "creating employer" citation policy in this case. *Wendland v. Ridgefield Const. Services, Inc.*, 184 Conn. 173, 439 A.2d 954 (1981), the case cited in *Murphy* as an example of judicial adoption of the "creating employer" citation policy, does not provide support for imposing liability upon a "creating employer" in the absence of control and responsibility for maintenance. In *Wendland*, the Connecticut Supreme Court held:

> [W]e follow the approach taken by the Court of Appeals for the Second Circuit in the *Brennan* case. Thus, where an employer is in control of an area and responsible for its

---

10. The scope of the multi-employer worksite doctrine has been apparently limited to reflect the traditional elements of negligence liability, e.g., foreseeable plaintiffs. For instance, the Seventh Circuit has noted that "the class of employees who will trigger liability under the multi-employer doctrine should be limited to those with regular access to the areas controlled or directly impacted by the employer accused of violating a safety regulation. Although the logical class is composed of those on a given work site, it may in certain circumstances be narrower." *Pitt–Des Moines, Inc.*, 168 F.3d at 985. And as implied by the "Second Circuit . . . in *Brennan*, the doctrine is limited to exposure by the employees of the violating employer 'or those of other employers engaged in a common undertaking.' " *Pitt–Des Moines, Inc.*, 168 F.3d at 985 (quoting *Brennan*, 513 F.2d at 1037). The Seventh Circuit resolved:

> PDM could be liable for the death of [non-employee] Thormeyer under the multi-employer doctrine. Thormeyer was employed as an ironworker on the Post Office work site. His job was to follow PDM's raising gang and bolt-up the connections they made. He belonged on the site and regularly worked within the zone of danger created by any unsafe connections. Thormeyer was an *entirely foreseeable victim* of any willful safety violations PDM may have committed and thus easily fell within the multi-employer doctrine.

*Pitt–Des Moines, Inc.*, 168 F.3d at 985 (emphasis added). In the case *sub judice*, the foreseeability issue was clearly a concern for the trial judge, as it should have been.

maintenance, as was the case here, a violation occurs if any employees working on the project have access to the hazard. . . . Thus in the present case, the defendant [subcontractor] was responsible for complying with applicable excavation regulations. The defendant violated the applicable safety regulations when it failed either to shore up or to cut back to an angle of repose the excavated earthen wall which eventually caved in on the plaintiff.

*Wendland,* 439 A.2d at 956 (footnote omitted) (citing *Brennan* in which the Second Circuit held that "[i]n a situation where, as here, an employer is in control of an area, and responsible for its maintenance, we hold that to prove a violation of OSHA[,] the Secretary of Labor need only show that a hazard has been committed and that the area of the hazard was accessible to the employees of the cited employer or those of other employers engaged in a common undertaking.").

Even though in *Murphy* and later in *Thompson,* the intermediate appellate court recognized an employer may be liable under MOSHA (or OSHA) for either creating *or* controlling a hazard, in both cases liability was ultimately determined by a combination of the two factors. For instance, in *Thompson,* the Court of Special Appeals stated that BG & E had a duty to a non-employee because it "erected and constructed the hazardous condition and retained actual control over the work area to which it had assigned Thompson." *Baltimore Gas & Electric Company v. Thompson,* 57 Md.App. 642, 651–52, 471 A.2d 768, 773 (1984). Additionally, weighing in favor of assessing liability against BG & E, even though it was technically not Thompson's employer, were facts indicating that "[Thompson's] work assignments came from or through BG & E's foreman and supervisors for fifteen months, from the time he was employed until the time he was injured, although his skills and performances were subject to his employer's supervision[,]" and that "Thompson had no reasonable alternative access supplied by BG & E." *Thompson,* 57 Md.App. at 644, 650, 471 A.2d at 769, 773. In the case *sub judice,* the Court of Special Appeals decoupled the creation and control aspects of

the "third circumstance" first recognized in *Murphy*, 53 Md. App. at 643, 455 A.2d at 71, stating:

> While we agree that C & M did not exercise control in this instance, it was undisputed that C & M did *create* the hazard when it framed the second and third floors of the row home and left the stairwell openings uncovered and exposed its own employees to the hazard. Liability under these circumstances was recognized in both *Murphy* and *Thompson*, but in *Thompson*, it was the control aspect of the exception that applied.

*Strub*, 193 Md.App. at 21, 996 A.2d at 411.

Leisenring was proffered as an expert witness to testify that C & M "violated the OSHA regulations and ANSI safety standards—general safety standards." Even if C & M "created" a hazard that was in violation of a regulation, it did not exercise continuing control, or even a presence, at the worksite at the time of Nocar's fatal accident. Thus, the facts of this case do not warrant this Court's adoption or application of the "multi-employer worksite doctrine" or its "creating employer" citation policy. Accordingly, the trial court was legally correct in not permitting Respondent's expert to testify that C & M owed a statutory duty to Nocar, as a "creating employer," to comply with MOSHA or OSHA regulations or that C & M's violation of the regulations caused Nocar's death.

## II.

■ At the close of all the evidence, C & M moved for judgment on the grounds that the evidence showed that Nocar assumed the risk of injury as a matter of law and was contributorily negligent as a matter of law. The trial judge was concerned: if "I grant this motion now and I'm wrong, then the case has to be tried completely over. If I deny it and then grant a motion [for judgment notwithstanding the verdict], then they have a verdict." Accordingly, the trial judge denied Petitioner's motion for judgment and the case was submitted to the jury, which found that Petitioner was not negligent. Before the Court of Special Appeals, C & M filed a

cross-appeal in order to obtain review of the trial judge's ruling on C & M's motion for judgment. In that court, Strub contended that whether the decedent assumed the risk was a jury question in "all but the clearest cases" because there was no direct evidence regarding how Nocar fell through the hole; therefore, the questions of assumption of risk and contributory negligence could not be resolved as a matter of law. The intermediate appellate court agreed stating:

> While we agree that there was no evidence presented that Nocar protested to working in and around the openings, we decline to hold that the court erred in submitting the issue to the jury *because there was no direct evidence offered by either party of what Nocar was doing when he fell.*
>
> ＊　　＊　　＊
>
> Whether Nocar actually climbed the ladder across to the opening, or whether he obeyed the instruction of his superior to wait until after lunch to install the return and fell for some other reason was for the jury to decide.

*Strub,* 193 Md.App. at 26, 27–28, 996 A.2d at 414, 415 (emphasis added). The Court of Special Appeals's analysis, therefore, focused on the lack of direct evidence about "how" Nocar fell through the holes in the floors and into the basement. This logistical element of the incident, however, is a not relevant to an assumption of risk analysis, although it might be relevant to a contributory negligence analysis where a voluntary encounter with a known risk might be "itself unreasonable." *See BG & E v. Flippo,* 348 Md. 680, 706, 705 A.2d 1144 (1998) (quoting *Warner v. Markoe,* 171 Md. 351, 359–60, 189 A. 260, 264 (1937) ("Contributory negligence defeats recovery because it is a proximate cause of the accident which happens, but assumption of risk defeats recovery because it is a previous abandonment of the right to complain if an accident occurs.")).

■ In reviewing the trial judge's ruling on C & M's motion for judgment we consider the evidence and reasonable inferences drawn from the evidence in the light most favorable to the party against whom the motion was made. Md. Rule 2–519 (2011); *see Wilkens Square, LLLP v. W.C. Pinkard & Co.,*

419 Md. 173, 18 A.3d 878 (2011); *Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 16 A.3d 159 (2011); *Imbraguglio v. Great Atlantic & Pacific Tea Company*, 358 Md. 194, 209–10, 747 A.2d 662, 670 (2000) (noting "inasmuch as the only issue is whether [decedent] assumed the risk of injury as a matter of law, our concern is only with the facts most favorable to the Petitioner on that issue"); *Nelson v. Carroll*, 355 Md. 593, 600, 735 A.2d 1096, 1099 (1999); *Oaks v. Connors*, 339 Md. 24, 29, 660 A.2d 423, 426, n. 4, (1995). When, as here, a defendant moves for judgment based on an affirmative defense, e.g., assumption of risk, or, as is more common, based on the legal insufficiency of plaintiff's evidence, a trial judge must determine if there is "any evidence, no matter how slight, that is legally sufficient to generate a jury question." *Tate v. Bd. of Educ.*, 155 Md.App. 536, 544–45, 843 A.2d 890, 895–96 (2004) (noting also that "[a]n appellate court reviewing the propriety of a grant or denial of a motion for judgment by a trial judge must conduct the same analysis."). Therefore, it would have been appropriate, in the instant case, for the trial judge to grant C & M's motion for judgment founded upon assumption of the risk if all reasonable inferences drawn from the evidence in a light most favorable to Strub led to only one logical conclusion, that is that Nocar assumed the risk of his injuries.

Essentially, Petitioner's position is that, even if the jury believed that C & M was negligent in causing Nocar's fatality, as a matter of law, that negligence could not establish C & M's liability because Nocar assumed the risk of his injuries. C & M contends that Nocar knew, appreciated and voluntarily encountered the risk of falling through the 26 foot deep unguarded hole. Petitioner notes prior Maryland cases where falling through an unguarded hole was recognized as a risk that "anyone of adult age must be taken to appreciate" citing *ADM v. Martin*, 348 Md. 84, 91–92, 702 A.2d 730, 734 (1997) and other cases discussed *infra*. Finally, Petitioner contends that "how" Nocar fell is immaterial to an assumption of the risk claim. Respondent contends, however, that Nocar did not know that the unguarded holes were unsafe because testimony was introduced at trial that the other employees on the site

did not perceive them as unsafe and that they worked around similar holes all the time. Moreover, citing *Thompson,* Respondent asserts that any danger that was "open and obvious" danger was "assuaged by his co-worker's use [of the opening] without constraint or incident." Finally, Respondent contends that the same result should be reached here as was reached in *Imbraguglio* where we held that an event that "may or may not have been expected to occur" was the cause of the fatal injury, and, therefore, as Respondent asserts, because we cannot know how Nocar fell, assumption of the risk could not be resolved as a matter of law.

In our view, assumption of risk was established as a matter of law by the evidence presented during the trial, thus, no determination of liability was required by the factfinder and Petitioner's motion for judgment, at the close of all the evidence, should have been granted. We have often "stated in earlier cases involving the assumption of the risk defense, 'where the facts are not in dispute and the plaintiff intentionally and voluntarily exposed [himself or] herself to a known danger, we will sustain the granting of a summary judgment or the direction of a verdict.'" *Morgan State v. Walker,* 397 Md. 509, 520–21, 919 A.2d 21, 28 (2007) (quoting *ADM,* 348 Md. at 102, 702 A.2d at 740); *American Powerlifting v. Cotillo,* 401 Md. 658, 663, 934 A.2d 27, 30 (2007) (holding that there was "no genuine issue of material fact" that the plaintiff had "assumed the usual and foreseeable risks" of the sport of weightlifting therefore summary judgment was proper); *Schroyer,* 323 Md. at 288–89, 592 A.2d at 1126 (reversing a trial court judgment for a plaintiff when she assumed the risk of her injury as a matter of law); *see also Gibson,* 245 Md. at 422, 226 A.2d at 276 (affirming an order granting a motion to dismiss on the basis of assumption of the risk).

Assumption of the risk "negates the issue of a defendant's negligence by virtue of a plaintiff's previous abandonment of his or her right to maintain an action if an accident occurs." *Cotillo,* 401 Md. at 668, 934 A.2d at 33 (quoting *McQuiggan v. Boy Scouts of Am.,* 73 Md.App. 705, 710, 536

A.2d 137, 139 (1998)). Thus, when a plaintiff can be shown, through words or conduct, to have expressly or impliedly consented to "voluntarily proceed to encounter [a known risk] ... as where ... he proceeds to walk over debris on the sidewalk carelessly strewn and left there by a construction contractor. If these are voluntary choices, the plaintiff may be found to have accepted the situation, and consented to relieve the defendant of his duty." Prosser and Keeton on Torts, § 68 at 481 (5th ed. 1984). Therefore, questions about the defendant's duty are irrelevant to an assumption of risk analysis because "any duty the defendant owed the plaintiff to act reasonably for the plaintiff's safety is superseded by the plaintiff's willingness to take a chance." *Schroyer* 323 Md. at 282, 592 A.2d at 1123.

■ "In Maryland there are three requirements that the defendant must prove to establish the defense of assumption of the risk: (1) the plaintiff had knowledge of the risk of danger; (2) the plaintiff appreciated that risk; and (3) the plaintiff voluntarily confronted the risk of danger." *Cotillo*, 401 Md. at 668, 934 A.2d at 33–34. In the instant case, the parties contest whether Nocar knew and appreciated the risk of falling through the unguarded openings at the construction site, and whether the evidence supports an assertion that Nocar confronted involuntarily the risk of a fall.

We have held that in determining "whether the plaintiff had the requisite knowledge and appreciation of the risk ... an objective standard" is applied. *Cotillo*, 401 Md. at 668, 934 A.2d at 34 (citing *Crews v. Hollenbach*, 358 Md. 627, 644, 751 A.2d 481, 490 (2000)); *see also Morgan State*, 397 Md. at 514, 919 A.2d at 24 (stating "the question of voluntariness, in the context of an assumption of the risk analysis, is measured by an objective standard."). In *Cotillo*, a weightlifter was held to have "assumed the risk that the spotters may have negligently failed to catch the bar because he knew that type of injury was foreseeable...." *Cotillo*, 401 Md. at 671, 934 A.2d at 35. Additionally, we held that as a professional weightlifter, Cotil-

lo had "direct knowledge of the inherent risks of powerlifting." *Cotillo,* 401 Md. at 669, 934 A.2d at 34.

Commentators have noted that there is a subjective and objective aspect to the issue of a plaintiff's knowledge. For instance, professors Prosser and Keeton have stated:

> The standard to be applied is, in theory at least, a subjective one, geared to the particular plaintiff and his situation, rather than that of the reasonable person of ordinary prudence who appears in contributory negligence.... At the same time, it is evident that a purely subjective standard opens a very wide door for the plaintiff who is willing to testify that he did not know or understand the risk; and there have been a good many cases in which the courts have said in effect that he is not to be believed, so that in effect something of an objective element enters the case, and the standard applied in fact does not always differ greatly from that of the reasonable person.

Prosser and Keeton, § 68 at 487–88 (footnote omitted); and cases cited therein; *see also* Speiser, Krause & Gans, The American Law of Torts § 12–53 at 431–33 (2008) (stating "[t]he standard to be applied is a *subjective* one—what the particular plaintiff, in fact, sees, knows, understands, and appreciates—as distinguished from the objective standard which is applied to contributory negligence."). This Court has recognized implicitly in prior decisions the subjective undertones to the objective standard of knowledge, for example, in *Imbragulio* we stated:

> 'In determining whether a plaintiff had knowledge and appreciation of the risk, an objective standard must be applied and a *plaintiff will not be heard to say that he did not comprehend a risk which must have been obvious to him.' Gibson,* 245 Md. at 421, 226 A.2d at 275. Thus, 'when it is clear that a person of *normal intelligence in the position of the plaintiff must have understood the danger,* the issue is for the court.' *Schroyer,* 323 Md. at 283–84, 592 A.2d at 1123.

*Imbraguglio,* 358 Md. at 213, 747 A.2d at 672 (quoting *ADM,* 348 Md. at 91–92, 702 A.2d at 734). Thus, the party must have known and appreciated the risk either because it is not credible that a similarly situated person would not have done so, or because the risk was so obvious that it could not have been encountered unwittingly. Simply stated, "the plaintiff will not be taken to assume any risk of either activities or conditions of which he has no ́ knowledge." Prosser and Keeton, § 68 at 487.

In prior opinions, we have noted, with approval, the proposition formulated by Prosser and Keeton that "there are certain risks which anyone of adult age must be taken to appreciate: the danger of slipping on ice, of falling through unguarded openings, of lifting heavy objects ... and doubtless many others." [11] *Morgan State,* 397 Md. at 515, 919 A.2d at 25 (quoting Prosser and Keeton, § 68 at 488); *accord Crews,* 358 Md. at 646, 751 A.2d at 491; *Imbraguglio,* 358 Md. at 213, 747 A.2d at 672; *ADM,* 348 Md. at 92, 702 A.2d at 734; *McClearn v. Southeast Concrete Co.,* 253 Md. 135, 139, 251 A.2d 896, 899 (1969); *Gibson v. Beaver,* 245 Md. 418, 421, 226 A.2d 273 (1967).

Prosser and Keeton have cited two cases for the proposition that the risk "of falling through [an] unguarded opening" is objectively appreciable by "anyone of adult age" in a position to encounter such a hazard, *Moulton v. Gage,* 138 Mass. 390 (1885) and *Schwartz v. Cornell,* 13 N.Y.S. 355 (1891). In *Moulton,* the Supreme Judicial Court of Massachusetts held that an ice house worker could not bring a negligence action against his employer for injury sustained by falling from a platform while clearing a jam on an "ice-run," stating:

---

11. Similarly, other commentators have noted that

[t]here are some risks as to which no adult will be believed if he says that he did not know or understand them. Thus, an adult who knowingly comes in contact with a fire will not be believed if he says that he was unaware of the risk that he might be burned by it; and the same is true of such risks as those as drowning in water or falling from a height in the absence of any special circumstances which may conceal or appear to minimize the danger.

Speiser, § 12–53 at 432–33.

The plaintiff was employed to work upon the platform as it was constructed. There was no hidden defect in it; it was what it appeared to be. The absence of the railing and the risks consequent thereon were obvious, and as well known to the plaintiff as to the defendants; and, upon familiar principles, the plaintiff cannot recover for injuries sustained in consequence of it.

*Moulton,* 138 Mass. at 393. By analogy, in the case *sub judice,* the hole in the floor of the third floor of the worksite "was what it appeared to be" and the "absence of [a] railing and the risks consequent thereon were obvious[.]" *Moulton,* 138 Mass. at 393. Even more *apropos* is the case of *Schwartz:*

Giving the plaintiff the benefit of all the propositions urged in his favor, namely that the foreman put in charge of the men, including the plaintiff's intestate, was incompetent, that the defendants were remiss and negligent in not covering the hole through which the intestate fell, and did not, therefore, discharge the duties they owed to the workmen, nevertheless the evidence shows conclusively, not only that the intestate knew of the existence of the hole, but that in working near it he exposed himself to danger voluntarily, inasmuch as he was not obliged to do his work at that point, and apparently chose it because it was more convenient, and involved less labor. . . . He is bound to protect himself by the use of his senses.

*Schwartz,* 13 N.Y.S. at 356.

The Court of Special Appeals summarized the pertinent facts of Nocar's injury as follows:

On May 26, 2006, Comfort Masters sent three of its employees, Nocar, Joshua Tudor and Andrew Pfarr, to the building to install a heating and cooling system, despite the fact that the stairs had not yet been installed. The three worked for approximately three hours that morning before Nocar's fall. Throughout the morning, the three worked with only two step ladders, as they had left one behind at the shop. They planned to retrieve a third ladder from the shop on their lunch break.

Tudor testified that, in addition to forgetting a ladder, they had neglected to bring other materials necessary for the installation of a return on the third floor. He testified: "We had no collars to hook to it. So I told him, I say, 'Wayne, there's no sense of putting this return box up just so that we have to take it down in an hour....'" Nocar agreed and Tudor went down to the second floor to begin another project. Tudor testified that soon thereafter Nocar had yelled down to him while he was working on the second floor to bring his ladder up to the third floor. Tudor testified that he told Nocar that he would give him his ladder in a minute after he finished the task he was working on when Nocar "leaned down in the hole ... and said 'Oh. You using it. Never mind.'" Then, according to Tudor, Nocar said "Fuck it. I'll just climb the bitch." Three or four minutes later, Tudor heard a loud noise and heard Pfarr scream. He walked to the opening of the second floor stairwell and saw the step ladder "dangling over the third floor" and realized that Nocar had fallen from the third floor into the basement. Tudor testified that, based upon the conversation minutes before the fall, he believed that Nocar had pulled the ladder that had been nailed into the stairwell up to the third floor to use it to install the return box on the third floor. He surmised:

The ladder was leaning right where the return box was supposed to go. The ladder was too tall to stand up in the hallway like straight. And the hallway was too narrow for him to fit up there. So what he did is he leaned it across the hole up against the metal stud.

And the metal studs are not made for structural [sic].

So when he leaned on it, it bent and tipped the ladder. During cross-examination, Tudor explained that he did not know for certain if Nocar fell as a result of positioning the ladder as he had described, but that he thought that he fell in that manner based on the circumstances and his knowledge of the task that Nocar was attempting to complete.
*Strub,* 193 Md.App. at 8–9, 996 A.2d at 403–04. In her brief, filed in this Court, Respondent also directs our attention to

statements made by Joshua Tudor during his testimony at trial including: that he had his back to the opening and did not see Nocar fall; that he did not know what Nocar was doing at the time of the accident; that he did not see Nocar pull the ladder up to the third floor; that he did not know if Nocar tripped over a steel box or something else that caused him to fall through the opening; that he did not know if Nocar was on the ladder or just positioning the ladder at the time of the fall; and that when Nocar said he was "going to climb it," Tudor thought that Nocar meant he was going to climb onto the roof.

Even in light of these additional facts, it is clear that Nocar was voluntarily working on the third floor, particularly when he and Tudor had discussed and decided that the work on the third floor could not be completed at that time and, therefore, Tudor descended safely to complete other tasks on the second floor. Moreover, Nocar objectively appreciated the "nature and magnitude of the potential injury" posed by falling through the unguarded openings in the floor because he undisputably poked his head through the third floor opening to communicate with Tudor and cannot be said to have remained unaware that just below him were two similarly sized holes with no guardrails or coverings in place. *Cf. Imbraguglio*, 358 Md. at 216–17, 747 A.2d at 675 (holding that while the plaintiff "possessed knowledge, as a matter of law, of the possibility of falling from the unguarded elevated pallet," ... he did not appreciate, as a matter of law, the risk of shifting bin contents, which was the ultimate cause of the fatal injury because it was not known whether content shift was "an expected or unexpected occurrence"). Finally, Nocar knowingly encountered the risk, regardless of whether he was standing on a ladder attempting to prepare the return-box apparatus as was testified by his co-worker or was doing something else, because the holes were an open and obvious hazard and the danger of falling through one or three of them would be foreseeable to a person of normal intelligence. In this case, Nocar "knew and appreciated the risk of danger, and voluntarily confronted that risk[,]" *Cotillo*, 401 Md. at

668–69, 934 A.2d at 33, because a person of normal intelligence in Nocar's position as a member of an HVAC installation work crew would have understood the danger of working around unguarded holes in the floors of a row house that was in the process of being rehabilitated. "In the usual case, [plaintiff's] knowledge and appreciation of the danger will be a question for the jury; but where it is clear that any person in his position must have understood the danger, the issue may be decided by the court." Prosser and Keeton, § 68, at 489; *accord Cotillo*, 401 Md. at 668, 934 A.2d at 34; *Hooper v. Mougin*, 263 Md. 630, 635, 284 A.2d 236, 239 (1971) ("Thus, a plaintiff is said to have assumed the risk as a matter of law only when the undisputed facts permit but one reasonable determination.").

The trial judge was appropriately cautious when considering C & M's motion for judgment. But the facts of this case reveal that "any person of normal intelligence in [Nocar's] position must have understood the danger" of performing work in the vicinity of large holes in the floors of an unfinished house. *Cotillo*, 401 Md. at 668, 934 A.2d at 34. In our view, reasonable persons could not differ as to the conclusion to be reached, which is that Nocar's conduct released any duty that C & M might have owed under the circumstances. Thus, the issue could have been and should have been decided in C & M's favor by the court on Petitioner's motion. *See Cotillo*, 401 Md. at 669, 934 A.2d at 34.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REINSTATE THE JUDGEMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY. COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

Judge ADKINS joins in judgment only.

ADKINS, J., concurring.

Respectfully, I join in the judgment only. The Majority rejects the Respondent's contentions that C & M owed a duty

of care to Nocar pursuant to MOSHA, and that expert testimony should have been admitted to support the MOSHA claim. I agree with that reasoning and result and would not go further. This decision upholds a jury verdict in favor of the Petitioners, who were defendants. There is no need to add dictum delving into the issue of whether Petitioners win for the additional reason that the Circuit Court should have granted a motion for judgment on grounds of assumption of the risk.